INTERSTATE COMMERCE COMMISSION v. LOUISVILLE & N. R. CO.

(Circuit Court, M. D. Tennessee. April 17, 1896.)

1. JURISDICTION OF THE UNITED STATES CIRCUIT COURT OVER ORDERS MADE BY THE INTERSTATE COMMERCE COMMISSION.

The jurisdiction of the United States circuit court is limited to an approval or disapproval, and to an enforcement or refusal to enforce an order of the commission. The court has no authority to modify the order of the commission.

2. SAME.

The court may go fully into the proof to determine whether it will approve an order made by the commission, and may hear any additional proof.

**3. SAME.**

An order made by the commission is essentially an administrative order, and is not final or conclusive in the sense of a court judgment or decree. And an order of the United States circuit court, enforcing an order of the commission, does not change its character or make it a final judgment.

**4. THE JURISDICTION OF THE COMMISSION.**

The function of the commission is both quasi judicial and administrative in its nature. The commission is required to make reports in writing in respect to complaints made to it. Such reports must include the findings of fact upon which the conclusions of the commission are based, and such findings so made are to be deemed prima facie evidence as to each and every fact so found in any judicial proceeding thereafter had.

**5. SAME.**

It was the intention of congress that the procedure before the commission should substantially conform to that before a court charged with the duty of finding the facts and giving judgment thereon, or to the investigation and report of a referee or special master in chancery, passing on both facts and law.

**6. SAME.**

The fact that the commission is composed of men of ability and experience, selected with reference to their particular qualifications therefor, and whose entire time is devoted to questions arising under the act, gives to its findings and opinion great weight. But, in order that the finding and opinion of the commission shall have the value intended, it should conform to the purpose of congress in requiring such proceedings. Its opinion or report should show what the issues in the case are, and what facts it finds in regard to such issues.

**7. SAME.**

It is not sufficient for the report of the commission to be made up of mere conclusions with respect either to law or fact. It should make suitable reference to the evidence where there is a conflict in the proof, and show how the commission settles the disputed fact; or, if the evidence in regard to any fact is undisputed, it should be so stated by the commission.

**8. SAME.**

Where, in a given case, it is the duty of the commission to receive and take into account evidence of certain facts, its failure to do so is error of law. And so, where an issue of fact is raised before the commission, its failure to dispose of it is an error of law.

**9. SAME.**

The commission has no power to make rates, and especially has the commission no power to order that rates from a given point to one city shall bear a certain relation to the rates from the same point to another city.

**10. REASONABLE RATES.**

Under the first section of the act to regulate commerce, the question may be made as to whether a given rate is, in and of itself, unreasonable and unjust. In the consideration of such a question rates to other places or points of shipment are unimportant, except as evidentiary circumstances; but where the conditions are similar, proof of rates charged by other roads is of great value.

**11. UNJUST DISCRIMINATION—UNDUE PREFERENCE.**

Under the second section of the act the question of unjust discrimination may arise, and under the third section the question of undue preference may arise. And in determining a question under either or both of those sections it may often, if not always, become necessary to contrast the rates to other places and persons, because those sections involve the question of relative rates, with all their elements.

**12. SAME.**

The burden of proving undue preference or undue prejudice rests upon the complaining party.

13. SAME.

The carrier's business of transporting goods involves the rights of, and the necessity of doing justice to, three parties. The interest of the seller at the point of departure, the interest of the carrier, and the interest of the trader or consumer at the point of delivery are all concerned in a given transaction, and must be duly considered by a tribunal or court in the decision of any case involving the carrier's freight tariff.

14. SAME.

Questions of unjust discrimination or undue preference must be treated broadly and practically. The carrier's business is one which involves so many considerations, and the necessity of taking into account so many conditions, that questions of this kind do not admit of any rigidly theoretical rules in their solution.

15. SAME.

It is impossible to exercise a jurisdiction, such as is conferred by the act to regulate commerce, by any process of mere mathematical or arithmetical calculation. When you have a variety of circumstances differing in the two cases, you cannot say that such a difference of circumstances represents or is equivalent to such a fraction of a penny difference of charge in the one case as compared with the other. A much broader view must be taken, and it would be hopeless to seek to decide a case by any attempted calculation.

16. SAME—COMPETITION.

In passing upon the question of undue or unreasonable preference or disadvantage, it is not only legitimate, but proper, to take into consideration, besides the mere difference in charges, various elements, such as the convenience of the public, the fair interests of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers, with reference to each other, as competitive or otherwise.

17. SAME.

The public at large is greatly interested in competition, and the more favorable prices which it brings, and for that purpose the public is interested in keeping open the larger markets of the country to all points of production and supply. Where traffic from a distance can compete with traffic nearer the market, the public is interested in having the greater distance traffic carried at rates which will enable it to compete with the traffic which is nearer the market.

18. SAME.

The advantageous position of one trader in having his works so placed that he has two competing routes is as much a circumstance to be taken into consideration as the geographical position of another trader, who, though he has not the advantage of competition, is situated at a point on the line geographically nearer the market.

19. SAME.

The fact that a lower rate is charged from a more distant point by reason of a competing route, which exists thence, is one of the circumstances which may be taken into account, under the provision of the second and third sections of the act to regulate commerce.

20. SAME—MILEAGE RATES.

Mileage, while a circumstance to be considered with all the other facts and conditions, is by no means controlling, or the most important.

21. DISCRIMINATION BETWEEN SUMMER AND WINTER RATES ON COAL.

The act to regulate commerce is not to be construed so as to abridge or take away the common-law right of the carrier to make contracts, and adopt proper business methods, further than its terms and recognized purposes require. A railroad company may lawfully charge lower rates on coal in the summer months in order to keep its coal cars and coal crews employed during that season of the year, provided such rates be offered in good faith to all persons upon equal terms.[1]

---

[1]Headnotes approved by Judge Clark.

A. G. Safford, for plaintiff.
Ed. Baxter, for defendant.

CLARK, District Judge.    This case had its origin in an informal complaint laid before the interstate commerce commission at the instance of certain citizens of Nashville, upon which, the commission having decided to investigate the matter, an order was made calling upon the defendant for an answer, which was in due time filed before the commission.    The commission, under proper orders, directed proof taken in regard to the questions raised by this answer to the complaint.    When the proof was in, the case was heard before the commission, and resulted in a report and order by the commission.    The defendant was directed by this order to make certain changes in its rate of charges on coal traffic from certain mines in western Kentucky to Nashville, Tenn., and particularly the rates from Earlington, Ky., to Nashville; and, as the principle involved is the same, it will be convenient to refer to Earlington alone as the shipping point in question, it being the principal point of production and shipment.    The defendant, denying that this order was a legal and proper one to be made upon the facts, refused to obey the same, and thereupon the commission, pursuant to section 16 of the interstate commerce act, has filed this bill in the United States circuit court for the Middle district of Tennessee to enforce the order and mandate of the commission.    The original complaint put before the commission alleged discrimination—First, in favor of Memphis and against Nashville, in the rates on coal from the Earlington mines; and, second, discrimination in the rates to consumers at Nashville, between persons engaged in certain manufacturing and in running steamboats and the public generally.    The defendant had so readjusted its rates to Nashville pending the investigation, and before the decision of the case by the commission, that the established rate then was $1 per ton to all persons on that kind of coal known as "run of the mines, nut and slack," and this rate was uniform the entire year round.    On what is called "screened coal" the rate was $1.15 per ton during the period from April 1st to September 1st; while for the remainder of the year, to wit, from September 1st to April 1st, the rate was $1.40 per ton.    The rate to Memphis remained just as it was; it being a uniform rate on all coal, and at all seasons, of $1.40 per ton, from the same mines to Memphis.    This change in the rate and in the company's method of doing business had eliminated from the case, when the commission came to act on it, every disputed question, except that of the alleged discrimination in favor of Memphis as against Nashville; and really all that was then complained of in this respect was the difference in the rate on "screened coal" from Earlington to Nashville of $1.40 per ton from September 1st to April 1st of the year, which, as will appear, was the difference between a rate of $1.15 per ton and $1.40 per ton; and the only order which the commission made affecting the defendant was to reduce the rate from $1.40 per ton to $1.15 per ton, and to make that rate uniform the year round.    It will become necessary, therefore, only to consider in this case the order of the commission

which directed the defendant company to make the change above indicated, and what is said in this opinion is to be understood as having reference only to the action of the commission in this particular.   It is conceded by counsel for both sides of the case that the court, in its power and jurisdiction over the matter, is limited to an approval or disapproval, and to the enforcement or refusal to enforce the order of the commission as a whole or in part just as made by the commission, and that the court is without power or authority to treat the case as one originally instituted in this court, and make an order or decree of its own, or to modify the order of the commission for the purpose of making it conform to the opinion of the court in case the court should entertain a different opinion from that of the commission; and such would seem to be the proper construction of section 16 of the act.   This relieves the case of any issue on that point.   The court, of course, may go fully into the proof on its own examination to determine whether it will approve the order, and may hear any additional proof adduced.   So much of sections 1–3 of the interstate commerce act as are material to the matter now under consideration will be given, and are as follows:

"Section 1. * * * All charges made for any service rendered, or to be rendered, in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage, or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful.

"Sec. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The only complaint that could be made in regard to the rate in question here would be that such rates violated either section 1, 2, or 3, as above set forth.

Under section 1 the question might be made that a given rate was in and of itself unreasonable and unjust, and in the consideration of such question as this, rates to other places or points of shipment would be unimportant, except as a circumstance or fact in the proof, and having no other than an evidentiary bearing.   Under section 2 the question of undue discrimination, and under section 3 that of undue or unreasonable preference or advantage, would arise. In determining a question under either or both of these sections it would often, if not always, become necessary to contrast the rates

to other places and persons, for the objection under those sections would involve the question of relative rates, with all of their elements. A discrimination or unjust advantage might be complained of as made between persons at the same place and entitled to the same rates, or between traders at different places. The investigation conducted before the commission, and its order thereon, are quasi judicial, although it may be considered as settled that the proceeding is not a judicial one, as that term is used with reference to courts of general jurisdiction, and in the general administration of justice. The function of the commission is really both quasi judicial and administrative in its nature. By section 9 of the act persons claiming to be damaged by a violation of the provisions of the act are given an election to sue in the courts of the United States for such damage, or to make complaint to the commission. The procedure in a complaint before the commission is prescribed in section 13 of the act, and by section 14 the commission is required to make a report in writing in respect thereto, which shall include the findings of fact upon which the conclusions of the commission are based, and such findings so made are to be deemed prima facie evidence as to each and every fact found in any judicial proceeding thereafter had. The commission is authorized to provide for the publication of its reports and decisions, and for the distribution thereof. Other sections of the act, not necessary to be set out herein, make it evident, in my opinion, that while the investigation and report of the commission and its order thereon, as stated, do not constitute a judicial proceeding, still it was the intention of congress that the procedure should substantially conform to that before a court charged with the duty of finding the facts, and giving judgment thereon, or to the investigation and report of a referee or special master in chancery, passing on both facts and law. Congress having provided for such investigation and report in general terms only, it is not to be doubted that substantial conformity to a judicial proceeding was contemplated. And the importance of the commission's action, taking substantially the form of a judicial proceeding, is apparent when it is recognized that the commission is composed of men of ability and experience, selected for this position with reference to their particular qualifications therefor, and whose entire time is devoted to questions arising under this act. This gives to the commission's finding and opinion great weight, and entitles it to great consideration, both by the parties affected and by the courts, when called upon to enforce obedience to its mandates. For the commission's investigation and opinion to have this intended value, however, it should, in fact, conform to the purpose of congress in requiring such proceedings. It is not sufficient, therefore, in a report of its findings of fact and conclusions, to do so in such general way as not to disclose its views upon particular phases of the evidence, or its conclusions of law upon facts found with reference to the particular issues in the case. Stated in another form, it is not sufficient for the report to be made up of mere conclusions. Its opinion or report should show what the issues in the case are, and what facts it finds

in regard to such issues. The report should make suitable reference to the evidence adduced in regard to any particular question, where there is a conflict in the proof, showing how the commission settles the disputed fact; or, if the evidence in regard to any issue is undisputed, state that fact. In other words, the report should give the parties to be affected, as well as the court, in any judicial proceeding afterwards instituted, definite and distinct information as to what was found as facts, and the commission's opinion thereon, such as would be necessary to make a judicial opinion sufficient and satisfactory for the purpose of ordinary litigation. Now, the report of the commission in this case does nothing of this kind. It was not intended to cast upon the courts the labor of an original and independent examination, as in a case instituted here in the first instance. If so, action by the commission would be idle. The report should on all issues make a distinct showing, so that on its face it would be prima facie good as required under the act. The main issue made in the answer to the original complaint, as well as now in the answer to the suit in this court, is and was that the difference in the rates from the Earlington mines to Nashville and those from the same point to Memphis was rendered necessary and was justified by competitive freight rates at that point, and particularly in regard to the rates on coal, by competition in coal coming from the Pittsburg mines by means of river transportation to Memphis. The report of the commission, notwithstanding this was the main issue, makes but a passing allusion to the fact of competition at Memphis. The report shows nothing as to the cost of coal at the Pittsburg mines, the rate per ton at which it was transported to Memphis, or the price at which such coal was sold; and the commission does not consider nor decide to what extent, if at all, this competition affects the rates which the Louisville & Nashville Railroad Company can make on coal shipped from the Earlington mines to Memphis, so that the rate, together with the price, will enable that coal to be handled on the Memphis market. If the facts in relation to this question of competition were at all important in this case, it is certain that the commission did not so consider it, as that entire subject was summarily dismissed without any finding of facts or the expression of any opinion in regard thereto. Indeed, much of the argument at the bar on both sides has been directed to the question of what the commission did or did not find or decide in this case. It is contended, for example, by the learned counsel for the commission, that it did investigate, and did decide that the rate from Earlington to Nashville was in and of itself unreasonable and unjustly high, without regard to the Memphis rate at all; while counsel for the defendant earnestly insists (and successfully, I think) that the commission decided no such question. It is to be regretted, of course, that a report so important as this, both in its effect on the parties and as a basis of suit in this court, should become the subject of construction in order to ascertain what was really decided. It becomes necessary, therefore, in the outset, for this court to decide for itself between the opposing views of counsel, whether the commission decided that the rate from Earlington to Nashville was un-

reasonable and unjust; and a careful examination of the original complaint and the report and order of the commission forces me to the conclusion that no such question was presented or decided. From what has been stated, it is clear that nothing in this respect was presented in the original complaint, and there is but a single paragraph in the report of the commission which furnishes support to the view that it considered any such question. I think it may be gathered from the complaint and report that the commission was only discussing the relative rates between Memphis and Nashville.

Next to the last paragraph in the opinion of the commission is exactly the order which it made in the case, and may be safely taken as a condensed statement of its ruling, and this I will give in full, as follows:

"The rate should be so arranged that, while Memphis is getting a rate as low as $1.40, Nashville should have a rate from the same mines of not more than $1.00 on 'run of mines, nut and slack,' and not more than $1.15 'screened coal' at any season. It is therefore ordered that from and after this date, so long as the rate charged by the Louisville & Nashville Railroad Co. for the transportation of coal of any kind or class from the mines on its Henderson & Owensboro divisions in the state of Kentucky -to Memphis shall not exceed the amount of $1.40 per ton, the rate charged by the said company for the transportation from said mines to Nashville of coal classed as 'run of mines, nut and slack,' shall not at any time exceed the amount of $1.00 per ton, and the rate charged by said company for the transportation from said mines to Nashville of coal classed as 'screen coal' shall not at any time exceed the amount of $1.15 per ton. And any reduction made by the Louisville & Nashville Railroad Co. in the rate for the transportation of coal of any kind or class from said mines to Memphis shall be accompanied by a proportionate reduction in the rates charged for the transportation of 'run of mines, nut and slack coal,' and of 'screened coal,' respectively, from said mines to Nashville."

It appears from this that the commission fixed only a relative rate as reasonable for Nashville, having regard all the time to the rate at Memphis. The rate put in effect was clearly intended to be based on and in proportion to the Memphis rate, with the provision that, in the event there should be a reduction in the Memphis rate, there should be a proportionate reduction in the rates charged from the mines to Nashville. Upon what basis the proportionate rate was made between the two places the report again leaves undisclosed, except inferentially. As the case is, the rate established for Nashville depends upon the fortunes of the Memphis rate, and goes up or down with that. This order is wholly inconsistent with the proposition that any decision was made respecting the Nashville rate as being too high of itself and independently of the Memphis rate. If the rate to Nashville of itself had been under investigation the rates to Memphis were of little value as evidence compared with rates from Tracy City, from Coal Creek and other mines in East Tennessee, from Bon Air at Sparta, and from Alabama mines. Rates from these points, not only to Nashville, but to Chattanooga, Atlanta, and other cities, were readily obtainable from the Southern and other railways on application; and the conditions throughout are so similar that they would be of great value on that question.

If the commission had considered the Nashville rate, and ruled that this was unreasonably high, and made an order regular in form, and authorized by law, and upon proof of rates on other roads, where conditions are similar, it might be that defendant would have a serious issue on its hands. It remains then to treat the action of the commission in making the change which it did as based on either section 2 or 3 of the act. I think that the entire proceeding shows that the commission was of opinion that the Memphis rate worked a discrimination in favor of consumers of coal at that place against Nashville, under section 2, or that it effected an undue and unreasonable advantage under section 3 of the act, though the report does not distinctly state what view the commission entertained, or that it entertained either. Taking the case as it was, and the rates as put in effect at the time the commission decided the case, Memphis was left with an even or flat rate of $1.40 per ton on all classes of coal the year round; and Nashville, with a rate of $1 per ton on the cheaper class of coal, uniform for all seasons of the year, and with a rate of $1.15 on "screened" coal during the summer, and $1.40 during the winter. This was a difference of 40 cents per ton on the lower grade of coal (which was more largely consumed) in favor of Nashville the year round, and a difference of 25 cents per ton on "screened or grate" coal during the summer, with the same rate as Memphis on that class of coal during the winter. The average for the year on either class was much in favor of Nashville. It would hardly be contended that this absolute advantage in rates to Nashville as against Memphis would work such discrimination as to injuriously affect Nashville in commerce, industrial pursuits, or growth, and there is no proof in the record indicating any such condition of things as this. Under such rates every consumer and every trader at Memphis would pay a higher price for coal of the same quality than would be paid by the trader or consumer at Nashville. Just how this could injuriously affect Nashville has not been suggested, and it is certain, I think, that no process of reasoning could show how an injurious result to Nashville is brought about, unless upon the basis of a relative rate which consumers and traders at each place should have, taking into account the relative distance of the two cities from the Earlington mines, and by putting the rates between the two places on a mileage basis only. In this way the consumer at Nashville might plausibly say that, while getting a rate on coal which made it absolutely cheaper to him than the consumer at Memphis, the rate to him was still relatively higher than to Memphis. Stated in another form, the complaint from the Nashville trader would be that he did not obtain in the rates the full advantage to which his shorter distance from the mines entitled him as against the Memphis trader with the longer distance. And it may be concluded inferentially that the commission was controlled in its action by this view of a relative rate, such as would be established practically on a mileage basis.

For in the report it is observed:

"As between Memphis and Nashville, considering the respective distances of those two cities from the mines in western Kentucky, the rate of $1.00

per ton to Nashville does not seem to be low compared with the $1.40 rate to Memphis."

In the absence of a more definite finding and statement of conclusions by the commission, it must be assumed, as I think the result shows, that the commission contrasted the distance at which the two cities are situated from the mines, and also contrasted the difference in rates, and concluded that the Nashville rate was relatively too high, and that this mode of adjusting the rates gave an undue preference, and was a violation of section 3 of the act; and that the commission rested its decision in part, though not entirely, upon this proposition. The entire omission of any finding or conclusion in respect of competing rates at Memphis, and what effect, if any, this circumstance had on the case, leaves no choice but to infer—as I think may be safely done—that the commission excluded entirely from its consideration any question of competition, so far as it related to the only point actually ruled on by the commission, as the case was left when it was called upon to pass judgment. If, therefore, the defendant company had the right to put in issue the question whether or not it was controlled by competing rates at Memphis, and if it was the duty of the commission to take into consideration that element or condition in passing on the case, it becomes apparent that the action of the commission was erroneous in two particulars: (1) In its omission to make any finding at all in regard to the fact of competition; and (2) in its refusal or failure to take into account such competition, and to give the same due consideration, and without doing which it failed to dispose of the leading issue in the case. It is important, therefore, to determine whether the commission was under a legal duty to accept evidence of competition, and to investigate and decide thereon; for, if such evidence was competent, and was evidence which the commission was required to receive as other evidence, its report and order would be analogous to a court judgment, showing upon its face that the court had excluded from consideration material evidence in the case and had made no response whatever to one of the issues joined. And whether the commission treated the rate which the defendant company had in effect at Memphis as a violation of section 2 or 3 of the interstate commerce act, it seems not now open to doubt that the fact of competing rates was a condition which it must have taken into account, and must have duly considered as evidence in the case, and must have decided whether the company's defense, based upon that circumstance, was made out or not. In Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 51, it was pointed out by Judge Jackson that sections 2 and 3 of our interstate commerce act substantially embody section 2 of the English railway traffic act of 1854, and section 90 of the act of 1845. It was held, too, that the interstate commerce act having thus substantially adopted these provisions, the construction given to such provisions by the English courts must be received as incorporated in the act, and the supreme court of the United States announced the same proposition in Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 284, 12 Sup. Ct. 844, affirming the judgment below.

And, while the question in that case was one growing out of passenger traffic, it involved a construction of these sections of our act, and in the progress of the opinion Judge Jackson said:

"The English cases referred to above, and others that might be cited, establish the rule that, in passing upon the question of undue or unreasonable preference or disadvantage, it is not only legitimate, but proper, to take into consideration, besides the mere differences in charges, various elements, such as the convenience of the public, the fair interest of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers with reference to each other, as competitive or otherwise. The English decisions cited, and the case of Denaby Main Colliery Co. v. Manchester, S. & L. R. Co., 11 App. Cas. 97, 55 Law J. Q. B. 181, further establish that the burden of proving the undue preference or the undue prejudice rests upon the complaining party."

And the supreme court, in the same case just referred to, after reviewing the English decisions, stated the result as follows:

"In short, the substance of all these decisions is that railway companies are only bound to give the same terms to all persons alike under the same conditions and circumstances, and that any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge."

It is to be borne in mind that when competition enters as an element in the determination of a case, this question—whether or not there is an undue preference or advantage—is a question not of law, but of fact. Whether or not the evidence is competent, and must be taken into account, is, of course, a question of law; but, with the evidence once admitted, the issue them becomes one of fact. And so, if the commission ought to have received and taken into account the evidence of competitive rates, its failure to do so was an error of law; as was also its failure to dispose of this issue at all. When the evidence was admitted, the question of undue preference, as stated, is one of fact which should have been found. It may therefore be accepted as the result of the cases in this country that the circumstance of competition is an element which must be considered, and the English cases are now full and clear upon the subject.

It must be stated, too, that questions of this kind must be treated broadly and practically. The carrier's business is one which involves so many considerations, and the necessity of taking into account so many conditions, that questions of this kind do not admit of any rigidly theoretical rules in their solution. It must be kept in mind, too, that the carrier's business of transporting goods involves the rights of, and the necessity of doing justice to, three parties. The interest of the seller at the point of departure, the rights of the carrier, and the rights or interest of the trader or consumer at the point of delivery are all concerned in a given transaction, and must be duly considered by a tribunal or court in the decision of any case involving the carrier's freight tariff. It is entirely conceivable that by taking into account the interest and advantage of the trader at the point of delivery alone, serious injury might be done to the trader at the point of departure as well as the carrier, without any substantial benefit to the trader at the point of delivery; or a loss might be inflicted on the trader at the point of de-

parture, as well as the carrier, out of all proportion to any benefit conferred on those whose interests are at the point of delivery. And in referring to "trader" in this connection, either at the one point or the other, it is intended to use the word in a representative sense, as including all persons interested in the production and sale of a commodity at the point of departure of the goods, and all persons interested as dealers or consumers at the point of delivery. It was at one time thought doubtful whether the interests of the railway could be taken into account at all, but it is now established that they can be. Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 52; Ames v. Railway Co., 64 Fed. 176; Reagan v. Trust Co., 154 U. S. 412, 14 Sup. Ct. 1047.

There is also, besides the parties named, the interest of the public concerned in a traffic question like this. The public at large are greatly interested in competition,—with the more favorable prices which it brings, and, for that purpose, in keeping open the larger markets of the country to all points of production and supply. It is obvious, therefore, that in judicial action upon the question of rates the effect of the ruling must be closely observed, as it thus falls in different directions, and upon different interests, and no one particular interest can properly be considered to the exclusion of others. As the trader at the point of delivery, and who generally pays the rates charged, is the one actively complaining, it generally happens that his interest and that of the carrier are represented before the court, and thus brought out into prominence, and attention directed too exclusively to the proximate, rather than the more distant, results, and in a given case it may be to interests of relatively small magnitude. I will now refer briefly to two recent English cases involving the construction of the clauses in the English traffic act substantially embodied in ours. In the case of Phipps v. Railway Co. [1892] 2 Q. B. 242, the English court of appeals was considering a case which had been appealed from the decision by the railway commissioners. The statement of the case, so far as is necessary to be now noticed, was as follows:

"The case made by the company was that the comparatively lower rates charged to Butlins and Islip were forced upon them by the competition of the Midland Railway Company; that the lower charge was made bona fide, and was, in the terms of section 27 of the act of 1888, 'necessary for the purpose of securing in the interest of the public the traffic in respect of which it was made'; that there was still a difference of 6d. a ton in favor of the plaintiffs, and that the plaintiffs had not been injured by the rates charged to Butlins and Islip; and they produced evidence to show that the competition in the South Staffordshire market was such that a difference of 6d. a ton, or even less, in the price of iron of the same quality, would often be enough to secure a contract. The railway commissioners (Wills, J., Sir Frederick Peel, and Viscount Cobham) held that the London & Northwestern Railway Company, in fixing the rates in question, were entitled to take into account the circumstance that Butlins and Islip had access to another line of railway which was in competition with their own, and that no sufficient case of undue preference had been made out against them. The plaintiffs appealed."

The court of appeals, in giving its opinion and referring to a previous case, said:

"Is not it a question of fact, and not of law, whether such a preference is due or undue? Unless you could point to some other law which defines what

shall be held to be reasonable or unreasonable, it must be and is a mere question, not of law, but of fact.  The lord chancellor there points out that the mere circumstance that there is an advantage does not of itself show that it is an undue preference within the meaning of the act, and, further, that whether there be such an undue preference or advantage is a question of fact, and of fact alone.  No rule is given to guide the court or the tribunal in the determination of cases or applications made under the second section of the act of 1854.  The conclusion is one of fact, to be arrived at looking at the matter broadly and applying common sense to the facts that are proved. I quite agree with Wills, J., that it is impossible to exercise a jurisdiction, such as is conferred by this section, by any process of mere mathematical or arithmetical calculation.  When you have a variety of circumstances differing in the two cases, you cannot say that such a difference of circumstances represents or is equivalent to such a fraction of a penny difference of charge in the one case as compared with the other.  A much broader view must be taken, and it would be hopeless to seek to decide a case by any attempted calculation."

And, referring to the matter of mileage as a method of determining what a rate should be, the court said:

"Therefore, what they call attention to as their ground for alleging that there was no undue preference is this: that mileage rate is not, and cannot alone be, the test.  That where a train is started or taken from one point to another, there are certain initial charges and certain charges at the other end.  I will not call them 'terminal' charges, because that is a word used to describe different things, and the use of it often gives rise to misunderstanding and dispute, but certain initial charges, and certain terminating charges, which are constant whatever distance the train has traveled; and that, before comparing the mileage rate, you must in each case deduct those initial and terminating charges, and then, and then only, will the comparison be a fair one.  Now, dealing with the matter in relation to Butlins alone for the moment, can it be said that the railway commissioners were not entitled to take that circumstance into consideration, and, looking at the distance, and looking at the difference of charge, to say that it was not established to their satisfaction that there was undue preference, inasmuch as the railway company had pointed to circumstances which led them to the conclusion that there was no reason for saying otherwise than that the 6d. fairly represented the difference of charge which might be made without constituting any undue preference or any undue disadvantage?  It was on that ground distinctly, on that part of the case so far as the mere difference of charge to Butlins was concerned, that Wills, J., proceeded in his judgment. What he said may be shortly put thus: 'It is true that, if you try it merely as a matter of mileage, it is about a half penny as compared with one penny for the distance traveled, but when you eliminate from the charge those constant charges at both ends, which must always exist whatever the distance, when you consider the longer lead there is in the one case than the other, and when you consider the necessities of the case which are brought about by the active competition of the Midland, putting all those things together, the difference is not nearly large enough to render it either necessary or desirable that this court should interfere.' "

And, continuing, the court further said:

"Now, there is no doubt that in coming to that determination the court below did have regard to the competition between the Midland and the London and Northwestern, and the situation of these two furnaces which rendered such competition inevitable.  If the appellants can make out that in point of law that is a consideration which cannot be permitted to have any influence at all, that those circumstances must be rigidly excluded from consideration, that they are not circumstances legitimately to be considered, no doubt they establish that the court below has erred in point of law.  But it is necessary for them to go as far as that in order to make any way with this appeal, because, once admit that to any extent, for any purpose, the question of competition can be allowed to enter in, whether the court has

given too much weight to it or too little, becomes a question of fact, and not of law."

And, discussing the question of the trader's proximity to the market, the court observed:

"Can we say that the local situation of one trader, as compared with another, which enables him, by having two competing routes, to enforce upon the carrier by either of those routes a certain amount of compliance with his demands, which would be impossible if he did not enjoy that advantage, is not among the circumstances which may be taken into consideration? I am looking at the question now as between trader and trader. It is said that it is unfair to the trader who is nearer the market that he should not enjoy the full benefit of the advantage to be derived from his geographical situation at a point on the railway nearer the market than his fellow trader who trades at a point more distant; but I cannot see, looking at the matter as between the two traders, why the advantageous position of the one trader in having his works so placed that he has two competing routes is not so much a circumstance to be taken into consideration as the geographical position of the other trader, who, though he has not the advantage of competition, is situated at a point on the line geographically nearer the market. Why the local situation, in regard to its proximity to the market, is to be the only consideration to be taken into account in dealing with the question as a matter of what is reasonable and right as between the two traders, I cannot understand. Of course, if you are to exclude this from consideration altogether, the result must inevitably be to deprive the trader who has the two competing routes of a certain amount of the advantage which he derives from that favorable position of his works. All that I have to say is that I cannot find anything in the act which indicates that when you are left at large (for you are left at large) as to whether, as between two traders, the company is showing an undue and unreasonable preference to the one as compared with the other, you are to leave that circumstance out of consideration any more than any other circumstance which would affect men's minds. I should have said so, and I do say so, upon the act of 1854, and I find nothing in the act of 1888 to exclude any such consideration, if it is not excluded by the act of 1854."

And, treating of the railway's right and motive in the attempt to secure traffic, the court said:

"Of course, a railway company endeavors to secure the traffic for its own advantage. That is the motive which operates upon the railway company. Naturally enough they want to secure all the traffic they can in order to do the best trade they can. But I think that the legislature has here pointed out that in considering a question of this sort you are not only to consider the legitimate desire of the railway company to secure traffic, but that you are to consider whether it is in the interest of the public that they should secure that traffic, rather than abandon it, or not attempt to secure it. Of course, many cases might be put where, although the object of the railway company is to secure the traffic for their own purposes upon their own line, yet, nevertheless, the very fact that they seek by the charges they make to secure it operates in the interest of the public. One class of cases unquestionably intended to be covered by the section is that in which traffic from a distance of a character which competes with the traffic nearer the market is charged low rates, because, unless such low rates were charged, it would not come into the market at all. It is certain that, unless some such principle as that were adopted, a large town would necessarily have its food supplies greatly raised in prices. So that, although the object of the company is simply to get the traffic, the public have an interest in their getting the traffic, and allowing the carriage at a rate which will render that traffic possible, and so bring the goods at a cheaper rate, and one which makes it possible for those at a greater distance from the market to compete with those situated nearer to it. * * * I cannot but think that a lower rate which is charged from a more distant point by reason of a competing route which exists thence is one of the circumstances which may be taken into account

under those provisions, and which would fall within the terms of the enactment quite as much as the case to which I have called attention. Suppose that to insist upon absolutely equal rates would practically exclude one of the two railways from the traffic, it is obvious that those members of the public who are in the neighborhood where they can have the benefit of this competition would be prejudiced by any such proceedings. And, further, inasmuch as competition undoubtedly tends to diminution of charge, and the charge of carriage is one which ultimately falls upon the consumer, it is obvious that the public have an interest in the proceedings under this act of parliament not being so used as to destroy a traffic which can never be secured but by some such reduction of charge, and the destruction of which would be prejudicial to the public by tending to increase prices."

And Lindley, L. J., in a concurring opinion, expresses the same view in language as follows:

"Now, the appeal here is put, as it must be put, upon a question of law, viz. whether there is any rule which compels us to say that the commissioners had no right to take into their consideration the fact that Butlins and Islip had two routes of communication westward instead of one. It appears to me that there is no such rule, as I cannot help thinking it would be extremely unreasonable if there were. Upon what principle of good sense can any business man, or anybody else, exclude from his consideration the locality of either place? If there is a physical difference in favor of one or the other, or any artificial difference by reason of the facilities of traffic, whether by sea or by land, why is not everything which is material to be taken into account, and upon what principle can it be said that you are to exclude from consideration one of the main elements in the case? The observations which I have made have no reference to the equality clause. The equality clause imposes a rigid rule, and, putting it shortly, it is to the effect that for the same service the same sum is to be paid. One can understand that. Everything turns upon the words 'the same.' The moment the service is not the same, the rule does not apply; and it appears to me that, if the law were to the effect contended for, it would be extremely irrational."

So in the case of Mansion House Ass'n Railway Traffic v. London & S. W. Ry. Co. [1895] 1 Q. B. 932, before the railway and canal commission, the question was one of an unjust advantage or preference as between home and foreign goods, and Collins, J., giving the opinion, and referring to the argument of counsel, said:

"It is obvious that this argument, if accepted, would involve the most momentous consequences; consequences which Mr. Balfour Browne did not dispute. For instance, let us assume that some trader in Southampton made it his business to collect home merchandise of the same description named in the application, and to deliver it to the railway company there at fixed dates and in large quantities, just as the respondents now deliver foreign merchandise for delivery to London, and was charged by the company the same rate, namely, 6s. a ton. On a complaint by the present applicants impugning such charges as an undue preference, it would be open to the company to justify it by urging all these topics which have been recognized by many decisions, and are sanctioned by subsection 2, such as difference of conditions, reducing the cost, and increasing the profit of the company, the existence of competition by land or water from Southampton to London, and so forth; and if they prove their facts they might be entitled to have their complaint dismissed."

And another member of the commission, giving a separate concurring opinion, observed:

"The other alternative would be to raise the shipping rates to the level of the local rates. These shipping rates are charged upon traffic of a highly competitive character, and we may take it that they are fixed at the highest point that is consistent with securing a remunerative share of the traffic. I am not introducing competition to justify the preference, but only as a

factor in the result which it seems to me will inevitably follow upon the raising of the Southampton dock rates, namely, the loss of the whole shipping traffic to the railway. A slight increase would probably have this effect; any approximation to the level of the local rates most certainly so. It is not denied that the traffic would go to London by sea all the same, and at the same rates as before. The only difference would be that the railway company would be more or less impoverished, not to the advantage of the farmer, who would gain nothing, but solely to the advantage of the shipping interest, which is not, of course, wholly a British interest. * * * I am of opinion, therefore, that if not by the use of the words 'same or similar services,' then by the general sense of the proviso as interpreted by the learned judge, it is intended that in cases where undue preference of foreign goods is alleged, that we should take into consideration, as we have always been entitled to do in the case of home goods, the circumstances of the traffic as regards its quantity, its packing, its regularity, and all other matters affecting its cost to the company, except so far as they may be matters special to the foreign origin of the goods; that is, the limitation imposed by the proviso, the object of which is, in my opinion, not to give home traffic a preference over foreign traffic, but to place them in a position of strict equality."

It thus appears beyond question, without reference to further authorities, that, in every case where a difference in the rates between two points of shipment is the ground of complaint, a leading and important element in the determination of the question is that of competition or want of competition. It is entirely apparent, too, that other practical conditions are to be taken into account, and that the mileage, while a circumstance to be considered with all the other facts and conditions, is by no means controlling or the most important. As early as 1872 it had been fully demonstrated in England that equal mileage as a basis for settling the difficulty was entirely impracticable. In that year the committee upon the amalgamation of railways reported upon this subject, and the substance of this report is found in the note to the case of Ransome v. Railway Co., 1 Nev. & McN. 63, which was one of the Coal Traffic Cases. In reporting against equal mileage, the committee said:

"(a) It would prevent railway companies from lowering their fares and rates so as to compete with traffic by sea, by canal, or by a shorter or otherwise cheaper railway, and would thus deprive the public of the benefit of competition and the company of a legitimate source of profit.

"(b) It would prevent railway companies from making perfectly fair arrangements for carrying at a lower rate than usual goods brought in large and constant quantities, or for carrying for long distances at a lower rate than for short distances.

"(c) It would compel a company to carry for the same rate over a line which has been very expensive in construction, or which, from gradients or otherwise, is very expensive in working, at the same rate at which it carries over less expensive lines. In short, to impose equal mileage on the companies would be to deprive the public of the benefit of much of the competition which now exists or has existed, to raise the charges on the public in many cases where the companies now find it to their interest to lower them, and to perpetuate monopolies in carriage, trade, and manufacture in favor of those routes and places which are nearest and least expensive, where the varying charges of the company now create competition. And it will be found that the supporters of equal mileage, when pressed, often really mean, not that the rates they themselves pay are too high, but that the rates which others pay are too low."

As has already been seen in this case, the commission, so far as it rested its decision on the difference in rates to Nashville and Memphis, evidently worked out a result by contrasting the distance of

these places respectively from the Earlington mines, or upon a mileage basis. And the commission did not take into account, or make any finding or investigation in respect of, competitive rates at that point; and in this, I think, the commission was clearly in error. The commission based its ruling in part upon the ground that the defendant railway company was without right to make any difference between what may be called the summer and winter rates, and the commission required the company to reduce its winter rate so as to conform to the summer rate, and make that uniform the year round; and this brings up the question whether its opinion on that point was sound. Neither the commission in its report, nor its able counsel in the argument, have referred the court to any particular provision of the interstate commerce act with the terms or just implication of which this mode of doing business is in conflict. The commission, in its report, assigns no reason why such mode of business is not lawful, except the statement that it is not customary. Indeed, counsel for the commission took occasion to say expressly that he regarded this mode of adjusting its rates by the defendant so as to furnish a lower rate during the summer, or dull season, than was furnished during the winter, or active season, as a sound, perfectly just, and proper business method in and of itself, and apparently conceding that it might be well if the act of congress allowed the business to be transacted in this way. It is difficult to understand how the question of whether such a difference in rates had been customary or not was controlling in the decision of that point. It has not been suggested that there is any particular common-law principle which prohibited what was thus done, and it is certain that methods of business have been followed for almost time out of mind closely analogous to this. It is customary in manufacturing and other industrial establishments to lower the price of goods in order to keep business going during the summer, or dull season of the year. And so, too, it is a matter of common knowledge that coal in any market may be bought during the summer or heated season of the year at rates lower than it can be obtained during the winter, when the consumption is large, and the demand for this commodity active. It is well known, as the proof in this case abundantly shows, that it is very difficult for mining and manufacturing establishments to find market during the summer months for the product or output of such establishments. This is due to the fact that there is comparatively little demand for their products during those months. It has come to be well known, therefore, as the "surplus output" or product, and the question of a market for such surplus output during the dull season of the year is everywhere recognized as a difficult one, and concessions are made in prices and rates in order that this surplus output may be handled. This is necessary to enable those owning and operating such establishments to furnish employment to the common laborers of the country, whose subsistence depends upon continuous employment. It enables those operating such concerns to keep their working forces together, in order that a sufficient output may be furnished during the active season of the year to meet the increased demands of the trade. It is apparent,

therefore, that no sound public policy is affected by such mode of doing business, and counsel admits that it is in itself reasonable. just, and humane to those who need consideration most. It would be surprising, therefore, if it could be found that a mere business method, wholly without objection within itself, is repugnant to the spirit and purpose of the interstate commerce act. The injurious effect of a suspension of business during a dull season, with idle machinery, and with those dependent on wages thrown out of employment, is certainly entitled to some consideration in following out the possible results of such a rule as the commission here announces. And if those who own and operate mining establishments may properly attempt to keep the same going during the summer season, it would be singular if the railroad company may not also have the right of keeping such appliances and cars as it devotes to the coal traffic from becoming idle, and also avoid throwing the crews of men who operate such cars out of employment, by joining with the coal miners in a reduction of rates in order to find a market for the surplus output. The interstate commerce act is not to be construed so as to abridge or take away the common-law right of the carrier to make contracts and adopt proper business methods further than its terms and recognized purposes require, and upon this point I quote again from the opinion of Judge Jackson in the case referred to, in which he refers with approval to the language of Earle, C. J. Judge Jackson said:

"Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate so as to give undue preference or advantage, or subject to undue preference or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are recognized as sound, and adopted in other trades and pursuits. Conceding the same terms of contract to all persons equally, may not the carrier adopt both wholesale and retail rates for its transportation services? In Nicholson v. Railway Co. (1 Nev. & McN. 147), which involved the 'undue preference' clause of the act of 1854, Earle, C. J., said: 'I take the free power of making contracts to be essential for making commercial profit. Railway companies have that power as freely as any merchant, subject only (as to this court) to the duty of acting impartially without respect of persons; and this duty is performed when the offer of the contract is made to all who wish to adopt it. Large contracts may be beyond the means of small capitalists; contracts for long distances may be beyond the needs of those whose traffic is confined to a home district; but the power of the railway company to contract is not restricted by these considerations.' "

It is no objection to this method of doing business to say that certain persons—for example, large dealers and others whose position enables them to store away quantities of coal—take advantage of such low rates, and supply themselves during the summer months, while others not so situated, or who are engaged in such business as that they are without motive to do so, will not take advantage of the rates. This is no undue advantage or discrimination which is made by the company, or which results from its method of doing business at all. If such a difference as that suggested results, it

grows out of the difference between financial and business conditions, and results incidentally, and not from anything in the rates themselves. The act was not leveled at any such differences as these, but at arbitrary differences and inequalities in the rates and methods of doing business of the carrier. If the interstate commerce act should undertake to regulate so vast a business as that of the commerce of the country, so as to overcome social, business, and financial inequalities and conditions, the act would at once become nugatory in the difficulties which would attend its execution. All that could be reasonably required of the railroad would be to offer in good faith the reduced or summer rate to all persons on equal terms, so as to extend the advantages thereof to all persons who might choose to avail themselves thereof, and to require more than this would be absurd and unjust. And as bearing upon this point I can again express my view by referring to the opinion of Judge Jackson, in which he says:

"In Baxendale v. Railway Co. (Reading Case) 5 C. B. (N. S.) 336, 28 Law J. C. P. 81, Cockburn, C. J., after stating that, if it were made to appear that the disproportion [in rates] was not justified by the circumstances of the traffic, the court would interfere, proceeds as follows: 'So, again, if an arrangement was made by a railway company whereby persons bringing a large amount of traffic to the railway should have their goods carried on more favorable terms than those bringing a less quantity, although the court might uphold such an arrangement as an ordinary incident of commercial economy, provided the same advantages were extended to all persons under the like circumstances, yet it would assuredly insist on the latter condition.' And, while recognizing the duty on the part of the court to redress any injustice or inequality prohibited by the law, he makes the further pertinent observation: 'At the same time we must carefully avoid interfering, except where absolutely necessary for the above purpose, with the ordinary right (subject to the above-named qualifications) which a railway company, in common with every other company or individual, possesses, of regulating and managing its own affairs, either with regard to charges or accommodation as to the agreements and bargains it may make in its particular business.' As regards the 'undue preference' branch of the English acts, the effect of the decision seems to be that a company is bound to give the same treatment to all persons equally under the same circumstances; but that there is nothing to prevent a company, if acting with a view to its own profit, from imposing such condition as may incidentally have the effect of favoring one class of traders, or one town, or one portion of their traffic, provided the conditions are the same to all persons, and are such as lead to the conclusion that they are really imposed for the benefit of the railway company."

I am, therefore, without further discussion, clearly of opinion that the defendant railroad company had the right to make a difference in its summer and winter rates on the coal traffic. It is to be observed that I am not now called upon to pronounce any opinion as to whether either the summer or winter rate is in and of itself just and reasonable, being restricted, as before stated, to an approval or disapproval of the action of the commission.

The commission refers to the fact that the defendant road has been buying coal at the Earlington mines and selling on the Memphis market, and states that, as the price of coal is very low at Memphis, it presumes no profit could be made on the sale, and assumes that there must be a profit in the rate of transportation. The presumption that there is no profit in handling coal on the Memphis market

would apply equally to any dealer in that market, and is a presumption contrary to the course of business. It was only necessary, in order to know certainly the facts in the case, to call on the defendant company for a statement of the prices at which coal was bought at the mines and sold on the market at Memphis, and given these with the rate of transportation the truth would be made to appear without recourse to doubtful presumption.

I have considered whether or not, if the result of the commission's action might be sustained on any ground, I could reopen the case in this court, and allow the plaintiff to introduce proof to show whether or not the rate to Nashville is of itself too high. This could apparently be easily done by procuring the schedule of rates on coal to and from the points suggested herein, where the conditions are similar to the traffic between Earlington and Nashville. Whether I could do so under section 16 of the act is doubtful. As, in any event, I would be without power to substantially change the order made by the commission, and as I do not think that order is a lawful and proper one, I have concluded that it is best to decide the case upon the record as now made up. An objection is made to the form of the order, in that it is made in terms to operate indefinitely in the future without any reservation of the power of change or modification such as changes in traffic conditions might make absolutely necessary. It is argued that, if the order of the commission were made the judgment of this court, it would become a bar to any change in the future. I cannot, however, concur in this view. The order of the commission is essentially an administrative one, and is not final or conclusive in the sense of a court judgment or decree, and the order of this court is one merely to give effect to the order made by the commission, and does not change its character or make it a final judgment. There are no private vested rights in the order of the commission, or that of this court, such as exist in a regular judgment or decree of this court. And, if necessity should arise for a change in the tariff of rates, no reason is perceived why the carrier might not make this on notice to the commission under the act of congress, just as such carrier is permitted to do in regard to the published rates filed with the commission. But there exists another objection to the form of this order which goes deeper. I pass by now the very serious question of the commission's power to make rates at all. It has been seen that the order of the commission does not put in effect a rate at Nashville complete in itself, but only a schedule measured by the Memphis rate, and depending for its continuance or discontinuance, and for any modification or change, on the Memphis rate. If a change should be made in the rate to Memphis, it would be open to the Nashville trader under this order to complain that such change was arbitrary and unreasonable, and this would devolve on the commission, and next on the court, the duty of an examination and decision of the Memphis rate upon its own merits. So, too, if the trader at another point or place in the state should complain that the rates to the trader at Nashville violate the act, or the trader at Nashville should complain of discrimination in rates to the trader at another place in the state, the question in

each case would give rise to an inquiry into the rates at two places instead of one. These and other difficulties which would spring up in an attempt to keep in force the form of order made by the commission in this case are obvious enough without further enumeration. The rate to Nashville should stand on its own basis, independently of rates to Memphis or other places, except so far as other rates might be regarded as evidence and for their probative force only. The order is without precedent or analogy in court judgments or decrees. Conceding the doubtful power to fix a rate, it is certainly irregular, and one which I do not think the commission was warranted, under the act of congress, in making. It will be perceived, therefore, that the errors which are thought to exist in the action of the commission are such as relate to the method of investigation and the order made thereon, and to the grounds on which the commission based its action. There is in the case, in my opinion, no discrimination under section 2, and no undue advantage under section 3, to the Memphis trader as against the Nashville trader; and the proposition that the railroad was without power to make a difference in the summer and winter rates was, I think, erroneous; and whether or not the Nashville rate, considered upon its own merits, is unjust and unreasonably high, was not inquired about nor decided by the commission. The bill is therefore dismissed, with costs.

After the foregoing opinion was written it was withheld until the opinion in Cincinnati, N. O. & T. P. Ry. v. Interstate Commerce Commission (known as the "Social Circle Case") 16 Sup. Ct. 700, could be seen, the decision of the case having just been announced. That opinion is now before me, and with it also the opinion in Texas & P. Ry. Co. v. Interstate Commerce Commission, Id. 666. I find nothing in these cases which seems to call for any change or modification of the opinion as already written. On the contrary, so far as the same points were considered, these cases furnish authoritative confirmation of the conclusions reached from a study of the issues in advance of the light thrown upon the subject by these instructive cases. The Social Circle Case denies power in the commission to fix rates, and puts that question at rest. And the opinion in Texas & P. Ry. Co. v. Interstate Commerce Commission fully supports the proposition that in the determination of a question arising under sections 2 or 3 of the interstate commerce act, as between different places, the condition of competitive rates is an element which the commission must take into consideration, and that it is a material issue in the case which the commission is not at liberty to disregard.