INTERSTATE COMMERCE COMMISSION v. ALABAMA MIDLAND RY. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. June 2, 1896.)

1. THE ACT TO REGULATE COMMERCE.
   Commerce, in its largest sense, must be deemed to be one of the most important subjects of legislation, and an intention to promote and facilitate it, and not to hamper or destroy it, is naturally to be attributed to congress.

2. SAME.

The purpose of the act is to promote and facilitate commerce, by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations.

3. SAME—ORDERS OF THE COMMISSION.

The spirit and letter of the act require that orders made by the commission should have in view the purpose of promoting and facilitating commerce and the welfare of all to be affected, as well the carriers as the traders and consumers of the country.

4. THE SECOND SECTION—DISCRIMINATION.

The principal purpose of the second section is to prevent unjust discrimination between shippers. It implies that, in deciding whether differences in charges in given cases were or were not unjust, there must be a consideration of the several questions whether the services rendered were "like and contemporaneous," whether the kinds of traffic were "like," and whether the transportation was effected under "substantially similar circumstances and conditions."

5. SAME—CIRCUMSTANCES AND CONDITIONS.

All circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers, and consumers, should be considered by a tribunal appointed to carry into effect the provisions of the act.

6. SAME.

Whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not unjust. Some charges might be unjust to shippers. Others might be unjust to the carriers. The rights and interests of both must be regarded.

7. THE THIRD SECTION—PREFERENCE.

The third section forbids any undue and unreasonable preference or advantage. The mere circumstance that there is, in a given case, a preference or an advantage, does not, of itself, show that such preference or advantage is undue or unreasonable.

8. SAME—CIRCUMSTANCES AND CONDITIONS.

There is nothing in the act which defines what shall be held to be due or undue, reasonable or unreasonable. Such questions are not of law, but of fact; and those facts and matters which carriers, apart from any question arising under the statute, would treat as calling, in given cases, for a preference or advantage, are facts and matters which must be considered in forming judgment whether such preference or advantage is undue or unreasonable.

9. SAME—COMPETITION.

Among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign parts as in the case of traffic originating within the limits of the United States, competition that affects rates should be considered; and, in deciding whether rates and charges, made at a low rate to secure foreign freights which would otherwise go by other competitive routes, are or are not undue and unjust, the fair interests of the carrier companies and the welfare of the community which is to receive and consume the commodities are to be considered.

10. SAME—PREJUDICE.

When the section says that no locality shall be subjected to any undue or unreasonable prejudice or disadvantage, it does not mean that regard is to be had only to the welfare of the locality or community where the traffic originates, or where the goods are shipped on the cars. The welfare of the locality to which the goods are sent is also to enter into the question.

11. SAME.

It is impossible to exercise a jurisdiction such as is conferred by the third section by any process of mere mathematical or arithmetical calculation. A much broader view must be taken, and it would be hopeless to attempt to decide a case by any attempted calculation.

12. THE FOURTH SECTION—LONG AND SHORT HAUL CLAUSE.

The above observations with reference to the second and third sections are equally applicable to the fourth section, or the so-called long and short haul provision.

13. POWER OF COMMISSION TO FIX RATES.

There is no provision in the act that expressly or by necessary implication confers upon the commission power to fix rates.

14. POWER OF COMMON CARRIERS TO ADJUST THEIR RATES.

Subject to the two leading prohibitions, that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage, the act leaves common carriers, as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and, generally, to manage their important interests upon the same principles as are regarded as sound and adopted in other trades and pursuits.

15. COMPETITION BETWEEN RAILWAY LINES IN THE SOUTHERN RAILWAY STEAMSHIP ASSOCIATION.

The competition of the railway lines is not stifled, but is fully recognized, intelligently and honestly controlled, and regulated by the traffic association in its schedule of rates.

16. COMPETITION—ACTUAL AND POTENTIAL.

When the rates to Montgomery were higher a few years ago than now, actual, active, water-line competition by the Alabama river came in, the rates were reduced to the level of the lowest practical water rates, and the volume of carriage by the river is now comparatively small; but the controlling power of that water line remains in full force, and must ever remain in force as long as the river remains navigable to its present capacity.

17. A LOCAL RATE AS PART OF A THROUGH RATE.

The fact that a local rate is made part of a through rate does not render the through rate illegal, provided neither the local nor the through rate be unjust or unreasonable, and provided neither of them unjustly discriminates, or gives an undue preference or disadvantage to persons or traffic similarly situated.

Appeal from the Circuit Court of the United States for the Middle District of Alabama.

This was a proceeding by the interstate commerce commission against the Alabama Midland Railway Company and the Georgia Central Railway Company to require defendants to comply with its order of January 20, 1894, in response to the complaint of the board of trade of Troy, Ala. The suit was dismissed by the circuit court (69 Fed. 227), and the interstate commerce commission appeals.

L. A. Shaver, for appellant.

J. D. Roquemore, A. A. Wiley, and Ed. Baxter, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and BOARMAN, District Judge.

McCORMICK, Circuit Judge. Troy is situated between the Alabama and Chattahoochee rivers, 52 miles by the shortest railroad route from Montgomery, 80 miles from Eufaula, and 85 miles from

Columbus. It is a city of 4,000 or 5,000 inhabitants. On June 29, 1892, the board of trade of Troy filed with the interstate commerce commission, the appellant, a complaint against the Alabama Midland and the Georgia Central Railroads and their numerous connections, which contained six charges of violations of the provisions of the act to regulate commerce. Those charges are as follows:

"(1) That the Alabama Midland and Georgia Central and their connections unjustly discriminate against Troy, and in favor of Montgomery, in charging and collecting $3.22 per ton to Troy on phosphate rock shipped from the South Carolina and Florida fields, and only $3 per ton on such shipments to Montgomery, the longer-distance point by both said roads; and that all phosphate rock carried from said fields to Montgomery over the road of the Alabama Midland has to be hauled through Troy. (2) That the rates on cotton established by said two roads and their connections on shipments to the Atlantic seaports, Brunswick, Savannah, and Charleston, unjustly discriminate against Troy, and in favor of Montgomery, in that the rate per hundred pounds from Troy is forty-seven cents, and that from Montgomery, the longer-distance point, is only forty cents; and that such shipments from Montgomery over the road of the Alabama Midland have to pass through Troy. (3) That on shipments for export from Montgomery and other points within 'the jurisdiction' of the Southern Railway & Steamship Association to the Atlantic seaports, Brunswick, Savannah, Charleston, West Point, and Norfolk, a lower rate is charged than the regular published tariff rate to such seaports, in that Montgomery and such other points are allowed by the rules of said association to ship through to Liverpool via any of those seaports at the lowest through rate via any one of them on the day of shipment, which may be much less than the sum of the regular published rail rate and the ocean rate via the port of shipment; that this reduction is taken from the published tariff rail rate to the port of shipment; and that this privilege, being denied to Troy, is an unjust discrimination against Troy, in favor of Montgomery and such other favored cities; and that it is, also, a discrimination against shipments which terminate at such seaport, in favor of shipments for export. (4) That the Alabama Midland and the defendant carriers connecting and forming lines with it from Baltimore, New York, and the East to Troy and Montgomery, charge and collect a higher rate on shipments of class goods from those cities to Troy than on such shipments through Troy to Montgomery, the latter being the longer-distance point by fifty-two miles. (5) That the rates on 'class' goods from Western and Northwestern points established by the defendants forming lines from those points to Troy are relatively unjust and discriminatory, as against Troy, when compared with the rates over such lines to Montgomery and Columbus. (6) That Troy is unjustly discriminated against in being charged, on shipments of cotton via Montgomery to New Orleans, the full local rate to Montgomery, by both the Alabama Midland and the Georgia Central."

The Alabama Midland and the Central Georgia and many of their connections, immediate and remote, answered the complaint with a general denial of the charge of violating the provisions of the act, supported by such special matter as their respective situations furnished. The only feature of these matters specially pleaded now requiring notice is the allegation that the circumstances and conditions affecting rates at Montgomery and at Troy are substantially dissimilar. After due examination, taking proof, and hearing argument of counsel for the respective parties, and considering the case until August 15, 1893, the commission made its report, reviewing all the evidence, the oral arguments and the briefs of counsel, the pertinent provisions of the act, the decisions on it theretofore made by them and by the courts, and concluding thus:

"In pursuance of the conclusions arrived at in this case, it is ordered that the roads participating in the traffic involved cease and desist (1) from charging and collecting, on class goods shipped from Louisville, St. Louis, and Cincinnati to Troy, a higher rate than is now charged and collected on such shipments to Columbus and Eufaula; (2) from charging and collecting on cotton shipped from Troy via Montgomery to New Orleans a higher through rate than 50 cents per 100 pounds; (3) from charging and collecting, on shipments of cotton from Troy, for export via the Atlantic seaports, Brunswick, Savannah, Charleston, West Point, and Norfolk, a higher rate to those ports than is charged and collected on such shipments from Montgomery; (4) from charging and collecting, on cotton shipped from Troy to Brunswick, Savannah, and Charleston, a higher rate than is charged and collected on such shipments from Montgomery through Troy to those ports; (5) from charging and collecting on class goods, shipped from New York, Baltimore, and the Northeast to Troy, a higher rate than is charged and collected on such shipments to Montgomery; (6) from charging and collecting, on phosphate rock shipped from South Carolina and Florida fields to Troy, a higher rate than is charged and collected on such shipments through Troy to Montgomery."

A formal order to the same effect was made and filed among the records of the commission requiring compliance therewith on or before September 10, 1893, and a notice embodying this order, together with a copy of the report and opinion of the commission in the case, was forthwith duly served on each of the defendant corporations. The carriers, relying on the defenses interposed, did not comply with the order, and on January 20, 1894, this suit was brought. It progressed to the hearing, and on July 3, 1895, the circuit court delivered its opinion adverse to the ultimate findings and conclusions made and shown in the report and order of the commission, and made the decree, from which this appeal is taken, "that this cause be, and the same is hereby, dismissed out of this court." 69 Fed. 227.

It will be observed that charges 1, 2, 3, and 4, as made by the board of trade of Troy, allege departures from the "long and short haul" rule of the fourth section of the act, and charges 5 and 6 present another form of alleged unjust discrimination or undue preference. Charges 4 and 5 are the two principal ones in the complaint, and to these the bulk of the testimony relates. Charge 4 is that, on shipment of class goods from New York, Baltimore, and the East to Troy and Montgomery, respectively, over the Alabama Midland as the terminal road, higher rates are charged to Troy than on such shipments through Troy 52 miles further on to Montgomery. Charge 5 involves the through rates on class goods from Louisville and other Ohio river points to Troy on the one hand, and to Montgomery and Columbus on the other; the complaint being that in their rates to these points, respectively, the carriers unjustly discriminate against Troy.

There is no substantial dispute as to the respective rates charged, the distances, the character of service, the classification of the freight, the volume of trade going to or through the respective points and of that originating at them, and the number of railroads reaching each that could compete for the carriage of goods. The commission insists that there is no actual subsisting all water route competition at Montgomery, Columbus, or Eufaula, and that there is practically no competition of any kind at any point within the field of this inquiry, because at all the points claimed to be competitive the

rates are fixed by agreement between the carriers.    The counsel for the commission contend:

"(1) That competition between carriers—and there is none other attempted to be proven in this case—does not constitute such a substantial dissimilarity of circumstances and conditions as will, under the interstate commerce law, without authority from the commission, where the rule of the fourth section is involved, justify departures from the rule of a relative equality in rates, as between different localities, laid down in the third and fourth sections of the law.  (2) That if competition can, under any circumstances, justify departures from the rule of the law, the competition, if any, shown in this case cannot be invoked for that purpose.  (3) If the competition alleged in this case can justify any discrimination whatever against Troy, in favor of her competitors in business, Montgomery and Columbus, it does not justify discrimination to the extent shown.  (4) That the order of the commission in question in this case makes allowance for whatever dissimilarity of circumstances or condition, as between Montgomery and Columbus on the one hand, and Troy on the other, may have been proven."

After a full hearing in the circuit court, the judge of that court announced his views of the case in a carefully considered opinion, summing up his ultimate findings as follows:

"In any aspect of the case it seems impossible to consider this complaint of the board of trade of Troy against the defendant railroad companies, particularly the Midland and Georgia Central railroads, in the matter of the charge upon property transported on their roads to or from points east or west of Troy, as specified and complained of, obnoxious to the fourth or any other section of the interstate commerce act.  The conditions are not substantially the same, and the circumstances are dissimilar; so that the case is not within the statute."

On March 30, 1896, the supreme court announced its decision in Texas & P. Ry. Co. v. Interstate Commerce Commission, 16 Sup. Ct. 666, known as the "Import Case," and in Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, Id. 700, known as the "Social Circle Case."  In the opinion in the Import Case the court says:

"Commerce, in its largest sense, must be deemed to be one of the most important subjects of legislation; and an intention to promote and facilitate it, and not to hamper or destroy it, is naturally to be attributed to congress. The very terms of the statute—that charges must be reasonable, that discrimination must not be unjust, and that preference or advantage to any particular person, firm, corporation, or locality must not be undue or unreasonable— necessarily imply that strict uniformity is not to be enforced, but that all circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers, and consumers, should be considered by a tribunal appointed to carry into effect and enforce the provisions of the act.  The principal purpose of the second section is to prevent unjust discrimination between shippers.  It implies that, in deciding whether differences in charges, in given cases, were or were not unjust, there must be a consideration of the several questions whether the services rendered were 'like and contemporaneous,' whether the kinds of traffic were 'like,' whether the transportation was effected under 'substantially similar circumstances and conditions.'  To answer such questions, in any case coming before the commission, requires an investigation into the facts; and we think that congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not 'unjust.'  Some charges might be unjust to shippers.  Others might be unjust to the carriers.  The rights and interests of both must, under the terms of the act, be regarded by the commission.  The third section forbids any undue and unreasonable prefer-

ence or advantage in favor of any person, company, firm, corporation, or locality; and, as there is nothing in the act which defines what shall be held to be due or undue, reasonable or unreasonable, such questions are questions, not of law, but of fact. The mere circumstance that there is, in a given case, a preference or an advantage, does not, of itself, show that such preference or advantage is undue or unreasonable, within the meaning of the act. Hence it follows that, before the commission can adjudge a common carrier to have acted unlawfully, it must ascertain the facts; and here, again, we think it evident that those facts and matters which carriers, apart from any question arising under the statute, would treat as calling, in given cases, for a preference or advantage, are facts and matters which must be considered by the commission in forming its judgment whether such preference or advantage is undue or unreasonable. When the section says that no locality shall be subjected to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, it does not mean that the commission is to regard only the welfare of the locality or community where the traffic originates, or where the goods are shipped on the cars. The welfare of the locality to which the goods are sent is also, under the terms and spirit of the act, to enter into the question. The same observations are applicable to the fourth section, or the so-called long and short haul provision, and it is unnecessary to repeat them."

Further on in the opinion the court quotes at length, and without any note of qualification, the language of Mr. Justice Wills and Lord Herschell in Phipps v. Railway Co. [1892] 2 Q. B. 237, in which is embraced this language of Chief Justice Erle, used in Palmer v. Railway Co., 10 L. R. 1 C. P. 593:

"I beg to say that the argument from authority seems to me to be without conclusive force in guiding the exercise of this jurisdiction, the question whether undue prejudice has been caused being a question of fact, depending on the matters proved in each case."

When the Phipps Case was before the railway commissioners, Mr. Justice Wills, in the course of his opinion, said:

"I observe that these are, in my judgment, eminently practical questions [adjusting rates to circumstances and conditions]; and if this court once attempts the hopeless task of dealing with questions of this kind with any approach to mathematical accuracy, and tries to introduce a precision which is unattainable in commercial and practical matters, it would do infinite mischief and no good."

In reference to which Lord Herschell, when the case was on appeal, said:

"I quite agree with Mr. Justice Wills that it is impossible to exercise a jurisdiction such as is conferred by this section by any process of mere mathematical or arithmetical calculation. When you have a variety of circumstances, differing in the one case from the other, you cannot say that a difference of circumstances represents or is an equivalent to such a fraction of a penny difference of charge in the one case as compared with the other. A much broader view must be taken, and it would be hopeless to attempt to decide a case by any attempted calculation."

After reviewing the American cases, the supreme court says:

"The conclusions that we draw from the history and language of the act, and from the decisions of our own and the English courts, are mainly these: That the purpose of the act is to promote and facilitate commerce by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations; that, in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply

to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests, as well of the carrying companies as of the traders and shippers, and, in considering whether any particular locality is subjected to an undue preference or disadvantage, the welfare of the communities occupying the localities where the goods are delivered is to be considered, as well as that of the communities which are in the locality of the place of shipment; that, among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign ports as in the case of traffic originating within the limits of the United States, competition that affects rates should be considered, and in deciding whether rates and charges, made at a low rate to secure foreign freights which would otherwise go by other competitive routes, are or are not undue and unjust, the fair interests of the carrier companies and the welfare of the community which is to receive and consume the commodities are to be considered; that if the commission, instead of confining its action to redressing, on complaint made by some particular person, firm, corporation, or locality, some specific disregard by common carriers of provisions of the act, proposes to promulgate general orders, which thereby become rules of action to the carrying companies, the spirit and letter of the act require that such orders should have in view the purpose of promoting and facilitating commerce, and the welfare of all to be affected, as well the carriers as the traders and consumers of the country. It may be said that it would be impossible for the commission to frame a general order if it were necessary to enter upon so wide a field of investigation, and if all interests that are liable to be affected were to be considered. This criticism, if well founded, would go to show that such orders are instances of general legislation, requiring an exercise of the law-making power, and that the general orders made by the commission in March, 1889, and January, 1891, instead of being regulations calculated to promote commerce and enforce the express provisions of the act, are themselves laws of wide import, destroying some branches of commerce that have long existed, and undertaking to change the laws and customs of transportation in the promotion of what is supposed to be public policy."

In the opinion in the Social Circle Case it is clearly held that the question whether the circumstances and conditions are or are not substantially similar is one of fact, and, touching the power of the commission to fix rates, the court said:

"Whether congress intended to confer upon the interstate commerce commission the power to itself fix rates was mooted in the courts below and is discussed in the briefs of counsel. We do not find any provision of the act that expressly or by necessary implication confers such a power. It is argued on behalf of the commission that the power to pass upon the reasonableness of existing rates implies a right to prescribe rates. This is not necessarily so. The reasonableness of the rate, in a given case, depends on the facts, and the function of the commission is to consider these facts, and give them their proper weight. If the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fixes a rate, that rate is prejudged by the commission to be reasonable. We prefer to adopt the view expressed by the late Justice Jackson, when circuit judge, in the case of Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37, and whose judgment was affirmed by this court. 145 U. S. 263, 12 Sup. Ct. 844. Subject to the two leading prohibitions, that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and, generally, to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits."

Only two railroads, the Alabama Midland and Georgia Central, reach Troy. Each of these roads has connections with other lines,

parties hereto, reaching all the long-distance markets mentioned in these proceedings. The commission finds that no departure from the long and short haul rule of the fourth section of the statute, as against Troy as the shorter-distance point, and in favor of Montgomery as the longer-distance point, appears to be chargeable to the Georgia Central. The rates in question, when separately considered, are not unreasonable or unjust. As a matter of business necessity, they are the same by each of the railroads that reach Troy. The commission concludes that, as related to the rates to Montgomery, Columbus, and Eufaula, the rates to and from Troy unjustly discriminate against Troy, and, in the case of the Alabama Midland, violate the long and short haul rule. The volume of population and of business at Montgomery is many times larger than it is at Troy. There are many more railway lines running to and through Montgomery, connecting with all the distant markets. The Alabama river, open all the year, is capable, if need be, of bearing to Mobile, on the sea, the burden of all the goods of every class that pass to or from Montgomery. The competition of the railway lines is not stifled, but is fully recognized and intelligently and honestly controlled and regulated by the traffic association in its schedule of rates. There is no suggestion in the evidence that the traffic managers who represent the carriers that are members of that association are incompetent, or under the bias of any personal preference for Montgomery or prejudice against Troy that has led them, or is likely to lead them, to unjustly discriminate against Troy. When the rates to Montgomery were higher a few years ago than now, actual, active, water-line competition by the river came in, and the rates were reduced to the level of the lowest practical paying water rates, and the volume of carriage by the river is now comparatively small; but the controlling power of that water line remains in full force, and must ever remain in force as long as the river remains navigable to its present capacity. And this water line affects to a degree less or more all the shipments to or from Montgomery, from or to all the long-distance markets. It would not take cotton from Montgomery to the south Atlantic ports for export; but it would take the cotton to the points of its ultimate destination, if the railroad rates to foreign marts, through the Atlantic ports, were not kept down to or below the level of profitable carriage by water from Montgomery through the port of Mobile. The volume of trade to be competed for, the number of carriers actually actively competing for it, a constantly open river present to take a large part of it whenever the railroad rates rise up to the mark of profitable water carriage, seem to us, as they did to the circuit court, to constitute circumstances and conditions at Montgomery substantially dissimilar from those existing at Troy, and to relieve the carriers from the charges preferred against them by its board of trade.

We do not discuss the third and fourth contention of the counsel for the appellant further than to say that, within the limits of the exercise of intelligent good faith in the conduct of their business, and subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly dis-

criminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and, generally, to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits. The carriers are better qualified to adjust such matters than any court or board of public administration, and, within the limitations suggested, it is safe and wise to leave to their traffic managers the adjusting of dissimilar circumstances and conditions to their business.

We affirm the decree of the circuit court.