BREWER et al. v. CENTRAL OF GEORGIA RY. CO. et al.

(Circuit Court, S. D. Georgia, E. D. January 8, 1898.)

1. INTERSTATE COMMERCE LAW—LONG AND SHORT HAULS.

It is not unlawful to charge more for a shorter than for a longer haul, when the circumstances and conditions are in fact substantially dissimilar, although the interstate commerce commission has made an order forbidding such charges in the particular case. Interstate Commerce Com'n v. Alabama M. R. Co., 18 Sup. Ct. 45, followed.

2. SAME—EFFECT OF COMPETITION.

Competition between rival railroads, and not merely between rail and water carriers, is a factor to be considered in determining the substantial similarity or dissimilarity of circumstances and conditions under the fourth section of the interstate commerce law. Interstate Commerce Com'n v. Alabama M. R. Co., 18 Sup. Ct. 45, followed.

3. INTERSTATE COMMERCE—LONG AND SHORT HAUL—DISCRIMINATION—SIMILARITY OF CONDITIONS.

The charging of a greater rate for a shorter than for a longer haul is not a violation of the fourth section of the interstate commerce law, when the rate charged for the shorter distance is not in itself unreasonable, and the more distant point is a commercial center and large distributing point, where there exists strong competition, both by land and water, none of which conditions are present at the other point, as such difference creates a dissimilarity of "circumstances and conditions" within the meaning of the act.

In Equity.

W. E. H. Searcey, Jr., and L. A. Shafer, for complainants.
Ed Baxter, for defendants.

SPEER, District Judge. This suit in equity is brought by Brewer & Hanleiter, wholesale and retail grocers of Griffin, Ga., to compel compliance by the Central of Georgia Railway Company with an order of the interstate commerce commission. It appears from the record that Brewer & Hanleiter complained to the interstate commerce commission that freight rates to Griffin by the defendant company and its connections from Western points, such as Cincinnati, Ohio, and Louisville, were materially greater than rates on like traffic carried a greater distance of 60 miles through Griffin to Macon. The commission, on the 29th of June, 1897, announced its conclusions in favor of the complainants, and directed that the Central of Georgia Railway Company, with its connecting lines, should wholly cease and desist from enforcing rates and practices found and declared in the opinion of the commission to be unlawful, and that the defendants, including the Central of Georgia Railway Company, should wholly cease and desist from giving undue preference or advantage to the city of Macon, Ga., and merchants and dealers therein, and from "subjecting the city of Griffin, and complainants or other merchants or

dealers therein, to undue and unreasonable prejudice and disadvantage by maintaining, collecting, and receiving higher rates and charges for the transportation of freight of any kind or class from Cincinnati, Ohio, or Louisville, Ky., to Griffin, aforesaid, than they maintain, collect, and receive from the transportation of like kind of traffic from the same point of shipment, Cincinnati or Louisville, to Macon aforesaid"; and, further, that they should "wholly cease and desist from charging, demanding, collecting, or receiving any greater compensation in the aggregate for the transportation of various kinds or classes of freight articles from Cincinnati, in the state of Ohio, for the shorter distance to Griffin, in the state of Georgia, than they contemporaneously charge, demand, collect, or receive for the transportation of like kind of traffic from Cincinnati, aforesaid, for the longer distance, over the same line, and in the same direction, to Macon, in the state of Georgia." And the commission reiterates this order with regard to freight or articles shipped from Louisville, in Kentucky, to Griffin, in Georgia.

The defendant the Central of Georgia Railway Company, not obeying the order and directions of the commission, this bill was brought. It is alleged therein that the defendant company charges and receives greater compensation in the aggregate for the transportation of property or freight, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line in the same direction, the shorter being included within the longer distance, in that the said Central of Georgia Railway Company has charged and received from complainants on 50 barrels of flour from Nashville, Tenn., to Griffin, Ga., 29½ cents per 100 pounds, and on 115 pounds of chewing gum from Louisville, Ky., the sum of $1.43 per 100 pounds, whereas said defendant company charges and receives on the like kind of property the sum of 23 cents per 100 pounds and $1.07 per 100 pounds, respectively, to Macon, Ga., the same being a longer distance, over the same line, in the same direction, under substantially similar circumstances and conditions, the shorter distance to Griffin being included within the longer distance to Macon, Ga. This, it is alleged, is contrary to the laws of the United States of America, in that it violates section 4 of the act to regulate commerce, approved February 4, 1887; and, further, in that it violates and disobeys the report, opinion, and order of the interstate commerce commission of the United States, lawfully made and issued, and served upon said Central of Georgia Railway Company. The prayer of the bill is for an injunction restraining the defendant company, its officers, agents, and servants, under a proper penalty, from further continuing such violation and disobedience of the aforesaid order and requirement of the interstate commerce commission, and enjoining and requiring obedience to the same. The matter now under consideration by the court is an application for a temporary injunction pendente lite.

The answer of the Central of Georgia Railway Company presented by its counsel, Mr. Baxter, among other defenses, denies that the defendant company charges and receives, as alleged in the bill, greater

compensation in the aggregate for the transportation of freight, under substantially similar circumstances and condition, for a shorter than for a longer distance over the same line, in the same direction, for that the circumstances and conditions affecting such transportation existing at the one place are substantially dissimilar to those existing at the other.    There follows from this defense the further contention that the order of the interstate commerce commission, upon which the complainant relies, is unlawful, and that the defendant ought not to be compelled by the court to obey it.

It is not contended by the complainant that the freight rates charged by the defendant company and its connections on goods shipped to Griffin are unreasonable.    Neither in this court nor in the hearing before the commission was evidence offered to show that the Griffin rates were unreasonable.    The contention is that these rates were unreasonable as compared with the Macon rates.    Indeed, upon that subject the commission itself declares: "There is no testimony in this case from which we can say that the rate to Griffin was or was not too high 'in and of itself,' and we make no finding upon that question."    The commission further holds, however: "The claim that the rate to Griffin is 'in and of itself unreasonable' is not sustained. The burden of proving that issue is upon the complainants, and this burden they have not met."    On the other hand, there is much evidence that the rate to Griffin is reasonable.

Adopting the lucid order of the commission, the next inquiry is, do the lesser rates to Macon make an unjust discrimination against Griffin?    The deliverance of the commission upon this question is emphatic in expression, and, if justified by the facts, momentous and far-reaching in effect.    With, I trust, appropriate deference to the views of that learned and experienced board, I quote from the opinion itself:

"(2) Do the rates unjustly discriminate against Griffin in favor of Macon? That they discriminate, clearly appears from the findings of fact.    Every inhabitant of Griffin who buys a barrel of flour or a can of beef pays more for it than as though he resided in Macon.    The complainants are absolutely prohibited from competing upon equal terms with the Macon wholesaler outside the limits of the city of Griffin itself.    This sort of discrimination is intolerable, and should, under no circumstances, be permitted, unless justified by necessity.    Competition is alleged as the justification.    Plainly, water competition cannot be successfully invoked, for the only water competition is that from the East, and Griffin enjoys substantially the same Eastern rate as does Macon.    Macon has five competing railroads.    Griffin has two.    The two lines which enter Griffin are among the most powerful and active in the South.    Both these lines, by their connections, directly reach Louisville and Cincinnati, and compete directly for the business upon which the obnoxious rates are charged.    Why, then, does Macon enjoy the benefit of this competition, while Griffin does not?    Apparently for no other reason than that the railways interested arbitrarily determine that Macon shall be a 'basing point,' and that Griffin shall not be; competition shall be given its effect at Macon, and shall not be given its effect at Griffin.    No other reason is suggested, and no other reason is possible.    We do not think this accords with the spirit or the letter of the act to regulate commerce, the prime object of which was to do away with all sorts of discrimination.    It should not be left to the whim of one or half a dozen railroad managers to determine whether a given city may or may not be a 'trade center.'    The same causes which operate in one instance should have the same effect in another in-

stance.   We hold, upon the findings before us, that Griffin is entitled to as low a rate from Louisville and Cincinnati as is Macon, and that the charge of a higher rate is an unjust discrimination under section 3.   This Southern system of rate-making has been uniformly condemned by the commission as vicious in principle and in contravention of the act to regulate commerce. Harnell v. Railroad Co., 1 Interst. Commerce Com. R. 236; La Crosse Manufacturers' & Jobbers' Union v. Chicago, M. & St. P. Ry. Co., Id. 631; Martin v. Railroad Co., 2 Interst. Commerce Com. R. 46; Id., 32; In re Atlanta & W. P. R. Co., 3 Interst. Commerce Com. R. 24, 2 Interst. Commerce Com. R. 461; Cordele Mach. Shop v. Louisville & N. R. Co., 6 Interst. Commerce Com. R. 361."

Notwithstanding these vigorous utterances, and the fact that they are buttressed by reference in the opinion to a large number of precedents made by the commission in other cases, it is well to consider carefully the reasoning by which the finding of unlawful discrimination must be tested.   We have seen that the rates to Griffin are not in themselves unreasonable.   This is found by the commission itself.   There is no contention that the Macon rates are in themselves unreasonable.   By what specific charge, and by what specific facts, then, is the finding of unjust discrimination supported?   Not, certainly, by the mere fact that the Griffin rate is higher and the Macon rate is lower.   There can be no unjust discrimination of which commissions and courts can take cognizance, even though it be of that "intolerable" sort which should, "under no circumstances, be permitted, unless justified by necessity," unless it also be an unlawful discrimination.   To have merited the animadversions of the commission, these rates relative to these two Georgia cities must have been denounced by positive law, or its necessary implications.   In this statement the court finds high warrant in the ruling of the commission in Re Louisville & N. R. Co. v. Interstate Commerce Com'n, 1 Interst. Commerce Com. R. 57, expressed by Judge Cooley, one of its eminent members: "That which the act does not declare unlawful must remain lawful if it was so before, and that which it failed to forbid the carrier is left at liberty to do without permission of any one." That statement is, indeed, axiomatic.   The courts and the commissions of the United States must look to what is expressed or necessarily implied by the law for their authority to decide issues, and thus ascertain and determine the rights of contending parties.   To what law, then, are these rates obnoxious, if, indeed, they are, in any sense, illegal?   It is to be found, not in the third, but in the fourth, section of the interstate commerce act of congress of 1887.   This is popularly known as the "long and short haul clause."   It provides:

"Sec. 4. That it shall be unlawful for any common carrier subject to the provisions of this act to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance." 24 Stat. 380.

For an alleged violation of this clause the specific charges of the complainants' bill are made.   No violation of the third clause, or other violation of the terms and provisions of the interstate commerce act of congress, is made in the bill, save the formal indictment that the defendant has disobeyed the report, opinion, and order of the

interstate commerce commission lawfully made and issued, and served in this case, etc.; and whether that order, opinion, and report was lawfully made must be determined with strict regard to the charges made by the complainants in their case.    It is obvious, then, that the sole question for the court to determine is this:    Does the action of the defendant company in charging a rate on freight shipped from Western points to Griffin, greater than it charges on freight on the same class shipped to Macon, the longer distance, violate the fourth section of the interstate commerce act?    It is equally obvious that, if the more favorable rates to Macon are justified by circumstances and conditions at that point substantially dissimilar from those existing at Griffin, there has been no violation of law, and no judicial action is justifiable.    There are many circumstances and conditions at the important distributing point Macon affecting railroad rates which do not exist at Griffin, one of the most attractive and prosperous cities in the state.    A feature of this dissimilarity of the most substantial and striking character is pointed out by the commission itself.    In the opinion from which I have already quoted appears this language:

"The defendants also rely upon competition between railroads and markets which exists at Macon. This competition does undoubtedly exist in a most active form, and is the controlling factor in making the Macon rate; but that it creates such dissimilarity of circumstances and conditions as will justify the carrier in charging more for the short than for the long haul, without an order of this commission, is no longer an open question with us."

It is perhaps a legitimate inference from this language, no doubt carefully considered, that, while the dissimilarity of conditions actually exists, the sine qua non of the situation is an order from the commission adjudicating that fact.    It is presently to be seen, however, that, if the defendant company and its railway connections had applied to the commission for such an order, it would have been refused by that body, for, as further stated in the opinion, it was finally held in Trammell v. Steamship Co., 5 Interst. Commerce Com. R. 324, and In re Alleged Excessive Freight Rates & Charges on Food Products, 4 Interst. Commerce Com. R. 120, that competition between railroads subject to the act would never make out a case of dissimilar circumstances and conditions within the meaning of the statute.    This is conclusive, so far as the action by the commission is concerned, and yet the conclusion seems to be erroneous.    On November 8, 1897, since the opinion from which I have so largely quoted was rendered, and since the bill now before this court was filed, the supreme court, in the case of Interstate Commerce Com'n v. Alabama M. R. Co., 18 Sup. Ct. 45, has decided the commission's ruling that competition between railroads subject to the act could never make out a case of dissimilar circumstances within the meaning of the statute to be a misconstruction of the act.    The case decided by the supreme court is singularly like that at bar.    The Board of Trade of Troy, Ala., filed a complaint before the commission charging that the rates exacted for transportation of freight by the Alabama Midland Railway and its connections discriminated against the town of Troy, in Alabama, in violation of the interstate commerce act.    It is sufficient to show the

pertinency of the authority to state the first specific charge, which was that the Alabama Midland Railway and the defendant railroads forming lines with it from Baltimore, New York, and the East to Troy and Montgomery, charge and collect a higher rate on shipments of class goods from those cities to Troy than on such shipments through Troy to Montgomery; the latter being the longer distance point by 52 miles. If Griffin is substituted for Troy and Macon for Montgomery, we seem to have the precise case before us. There was also a charge of unjust discrimination under the third section of the interstate commerce act, such as the commission found to exist in the case now before the court. There, too, the commission brought a bill in equity in the circuit court of the United States for the Middle district of Alabama, to compel obedience to its order. The circuit court dismissed the bill. 69 Fed. 227. The circuit court of appeals for the Fifth judicial circuit affirmed the decision. 21 C. C. A. 51, 74 Fed. 715. An appeal was taken to the supreme court of the United States. 18 Sup. Ct. 45. That court affirmed the decision of the circuit court of appeals, and the ruling of the supreme court is conclusive of all material issues now under consideration. The learned Justice Shiras, speaking for the court, discusses in the outset of his opinion the effect of competition at one point as an element of dissimilarity of conditions between two shipping points:

"Whether," he announces, "competition between lines of transportation to Montgomery, Eufaula, and Columbus justifies the giving to those cities a preference or advantage in rates over Troy, and, if so, whether such a state of facts justifies a departure from equality of rates without authority from the interstate commerce commission under the proviso to the fourth section of the act, are questions of construction of the statute, and are to be determined before we reach the question of fact in this case."

The learned justice continues:

"That competition is one of the most obvious and effective circumstances that make the conditions under which a long and short haul is performed substantially dissimilar, and as such must have been in the contemplation of congress in the passage of the act to regulate commerce, has been held by many of the circuit courts. It is sufficient to cite a few of the number: Ex parte Koehler, 31 Fed. 319; Missouri Pac. Ry. Co. v. Texas & P. Ry. Co., Id., 862; Interstate Commerce Com'n v. Atchison, T. & S. F. R. Co., 50 Fed. 306; Interstate Commerce Com'n v. Cincinnati, N. O. & T. P. R. Co., 56 Fed. 943; Behlmer v. Railroad Co., 71 Fed. 835; Interstate Commerce Com'n v. Louisville & N. R. Co., 73 Fed. 409. In construing statutory provisions forbidding railway companies from giving any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatever, the English courts have held, after full consideration, that competition between rival lines is a fact to be considered, and that a preference or advantage thence arising is not necessarily undue or unreasonable. Denaby Colliery Co. v. Manchester, S. & L. Ry. Co., 11 App. Cas. 97; Phipps v. Railway Co., [1892] 2 Q. B. Div. 229. But the question whether competition as affecting rates is an element for the commission and the courts to consider in applying the provisions of the act to regulate commerce is not an open question in this court. In Interstate Commerce Com'n v. Baltimore & O. R. Co., 145 U. S. 263, 12 Sup. Ct. 844, it was said, approving observations made by Jackson, Circuit Judge, 43 Fed. 37, that the act to regulate commerce was 'not designed to prevent competition between different roads, or to interfere with the customary arrangements made by railway companies for reduced fares in consideration of increased mileage, where such reduction did not operate

as an unjust discrimination against other persons traveling over the road; that it was not intended to ignore the principle that one can sell at wholesale cheaper than at retail; that it is not all discriminations or preferences that fall within the inhibitions of the statute,—only such as are unjust or unreasonable.'"

The court, however, carefully guards the rights of the public against what may be termed a pretense of competition as a basis for discriminating rates, and uses this language:

"In order further to guard against any misapprehension of the scope of our decision, it may be well to observe that we do not hold that the mere fact of competition, no matter what its character or extent, necessarily relieves the carrier from the restraints of the third and fourth sections, but only that these sections are not so stringent and imperative as to exclude in all cases the matter of competition from consideration in determining the questions of 'undue or unreasonable preference or advantage,' or what are 'substantially similar circumstances and conditions.' The competition may in some cases be such as, having due regard to the interests of the public and of the carrier, ought justly to have effect upon the rates; and in such cases there is no absolute rule which prevents the commission or the courts from taking that matter into consideration."

The opinion of Justice Shiras then meets the contention of the commission that it is the tribunal exclusively intrusted with the power to determine whether or not the presence of competition produces circumstances and conditions which are substantially dissimilar:

"The claim now made for the commission," says the learned justice, "is that the only body which has the power to relieve railroad companies from the operation of the long and short haul clause on account of the existence of competition, or any other similar element which would make its application unfair, is the commission itself, which is bound to consider the question upon application by the railroad company, but whose decision is discretionary and unreviewable."

This position is at once assailed by Justice Shiras with ammunition taken from the magazine of the commission itself. He cites In re Louisville & N. R. Co. v. Interstate Commerce Com'n, 1 Interst. Commerce Com. R. 47, when Judge Cooley, for the commission, said, in speaking of the effect of the introduction into the fourth section of the words, "under substantially similar circumstances and conditions," and of the meaning of the proviso:

"The charging or receiving the greater compensation for the shorter than for the longer haul is seen to be forbidden only when both are under substantially similar circumstances and conditions; and therefore, if in any case the carrier, without first obtaining an order of relief, shall depart from the general rule, its doing so will not alone convict it of illegality, since, if the circumstances and conditions of the two hauls are dissimilar, the statute is not violated. * * * Beyond question, the carrier must judge for itself what are the 'substantially similar circumstances and conditions' which preclude the special rate, rebate, or drawback which is made unlawful by the second section, since no tribunal is empowered to judge for it until after the carrier has acted, and then only for the purpose of determining whether its action constitutes a violation of law."

The supreme court concludes that competition between rival routes is one of the matters which may lawfully be considered in making rates, and that substantial dissimilarity of conditions and circumstances may justify carriers in charging greater compensation for the transportation of like kinds of property for a shorter than for a longer distance over the same line. With even more decisiveness it

disapproves the proposition that it was the intention of congress that the decision of the commission could not be reviewed by the courts.

I need now to advert briefly to the circumstances and conditions which exist at Macon and do not exist at Griffin. In the copious quotations made by the supreme court from the valuable opinion of Circuit Judge McCormick in the circuit court of appeals may be found a striking parallel in their relative conditions:

"The volume of population and of business at Montgomery is many times larger than it is at Troy. There are many more railway lines running to and through Montgomery, connecting with all the distant markets. The Alabama river, open all the year, is capable, if need be, of bearing to Mobile, on the sea, the burden of all the goods of every class that pass to or from Montgomery. The competition of the railway lines is not stifled, but is fully recognized, intelligently and honestly controlled and regulated by the traffic association in its schedule of rates. There is no suggestion in the evidence that the traffic managers who represent the carriers that are members of that association are incompetent, or under the bias of any personal preference for Montgomery, or prejudice against Troy, that has led them, or is likely to lead them, to unjustly discriminate against Troy."

Looking, however, to the record of the case as presented to the supreme court, the parallel is even more striking. Troy is at the intersection of the Alabama Midland Railway, which is part of the Plant System, and the Mobile & Girard Railroad, which is part of the Central of Georgia. Griffin is at the intersection of the Central of Georgia Railway and of the Southern Railway. There is no other railroad at Troy, and it has no water transportation. This is true of Griffin. Its population is between 3,000 and 4,200. The population of Griffin is perhaps between 5,000 and 6,000. Montgomery is situated practically at the head of navigation on the Alabama river. Macon occupies the same position on the Ocmulgee river. Montgomery possesses five independent lines or systems of railroad. Macon has the same number. To be more specific, Macon is reached by the Central of Georgia, from Savannah to Macon and Macon to Atlanta; the Southern Railway, from Atlanta to Macon and Macon to Brunswick; the Georgia Southern & Florida Railway, from Macon to Palatka, Fla.; the Southwestern, from Macon to Eufaula, Ala., including branches to Albany, Ft. Gaines, and Columbus; Macon & Northern, from Macon to Athens; Macon & Dublin, from Macon to Dublin; the Macon & Birmingham, from Macon to La Grange; the Georgia Railroad, from Macon to Augusta and to Atlanta, now controlled by the Louisville & Nashville, giving an additional independent line to the West. The population of Montgomery is between 30,000 and 35,000. The population of Macon is between 35,000 and 38,000. There are between 130,000 and 175,000 bales of cotton handled at Montgomery annually. Macon receives from local planters 75,000 bales annually, and handles through her three large compresses 225,000 more. The wholesale and retail trade of Montgomery, estimated, is $40,000,000. As early as 1890 the volume of business transacted in Macon amounted to $45,441,650. While Montgomery has three cotton factories, Macon has five. To show the importance of Macon as a trade center and distributing point for railway traffic, it appears that during the month of November Macon received 2,318 car loads of freight,

300 more than any other city in Georgia save Atlanta, and more than ten times as many as were received in Griffin. Macon is almost in the exact geographical center of the state. It was the first inland terminus of the first railroad constructed in Georgia,—what is now the Central of Georgia Railway. It is situated on the Ocmulgee river, and was for many years, and until the phenomenal development of the railway system of the South, at the head of active navigation on that important stream. It is but 49 miles from Hawkinsville, to which point a line of steamboats regularly ply. The railroad commission of Georgia have fixed a rate from Macon to Hawkinsville, which, with the steamboat rates, even now affords to Macon all the advantages of water competition. It is, moreover, true that very recently a new steamboat has been constructed to navigate the Ocmulgee from Macon to the sea and from the sea to Macon. Its industrial development is remarkable, and various in character. It has ever been, since its settlement, a great distributing point for middle, southwest, and northern Georgia, and its wholesale trade is very large. It is true that the traffic on the Ocmulgee does not, at present, approximate that borne by the Alabama to and from Montgomery, but the Ocmulgee is a navigable stream. The government has compelled the construction of draws, so that river craft may pass all of the bridges which might interfere with the navigation to Macon. It has made appropriations for its improvement. The river was long used by the government for the transportation of its troops and material in the Indian wars, and for many years lines of steamboats were operated to and from Macon, and very recently these ventures have been renewed. It cannot be doubtful that it is easily feasible for Macon merchants to confront the railroads with water competition, if injurious rates were imposed upon them. But water transportation is not the important element of that strenuous competition between carrier and carrier and market and market which makes the conditions and circumstances at Macon so dissimilar from those at Griffin. It is perhaps enough to point out that the commission reports this competition to exist in its most active form. To test the extent of these dissimilar conditions, I have but to point to what would be the result if the Macon rates were advanced to equal the Griffin rates. Railroad competition at Macon exceeds that at Griffin as the competing roads which center at Macon exceed the competing roads which pass Griffin, and the competition of markets which Macon merchants are compelled to meet is far greater than that which confronts the Griffin merchants. To illustrate, Macon competes with Savannah for the trade of much of the country traversed by the main line of the defendant company. It competes with Eufaula and Columbus on the Southwestern Railroad and its several branches, and on the several other lines reaching the city with numerous markets and communities, none of which the merchants of Griffin can reasonably hope to reach. It is evident, therefore, that, since these competitive markets have, many of them, equal advantages in rates with Macon, if there be an advance in the cost of transportation, the commerce of Macon would be destroyed in exact proportion with its inability to meet the prices of its competitors. While this is true, the

producers and consumers at Griffin would not be benefited by the advance of Macon rates. If there should be an advantage at all accruing to Griffin, it would be to a few merchants. Besides, Augusta, Savannah, Brunswick, and Columbus all have water competition. Columbus may compete with Griffin, but the three other cities do not, while all are lively competitors of Macon. Analyzing the proposition of the complainant, made, it seems to me in disregard of the dissimilar circumstances and conditions existing at Macon, it would, if successfully maintained, result in the destruction of the immense wholesale and retail commerce of Macon upon which thousands depend for their daily livelihood, which serves a vast territory, and the increment of which adds thousands annually to the aggregate wealth of the state, in order to give a possible benefit to a few Griffin merchants. Even this advantage to the merchants of Griffin is scarcely more than problematical. Griffin, with equal rates, could not successfully compete with Macon, unless it could approximate its large supply of capital, so essential to modern commerce. To illustrate, Brunswick has the same rates as Savannah. Its harbor is as fine as that of Savannah, and yet, not possessing the abounding capital of Savannah, no one can pretend it has been its successful competitor. While the increased rates to Macon would, therefore, not probably benefit Griffin to any appreciable extent, for the reason that Macon is a point where competition with many other markets exists, it would, in all likelihood, so seriously cripple the business of Macon as to be injurious beyond measure. The effect on the defendant company would also be damaging, perhaps incalculably so. It is not to be presumed that such great railroads as, for instance, the Louisville & Nashville, now reaching Macon by an independent line of its own, would increase its rates, and offend its patrons, in order to save the Central from loss of shipments. The Louisville & Nashville would seek to retain and increase its popularity by serving its shippers at the rates already of force. The inevitable result would be that the Central, with a compulsory advance of rates, would lose its business, and its competitor would acquire it. Now, in the celebrated case of Texas & P. R. Co. v. Interstate Commerce Com'n, known as the "Import Case," 162 U. S. 235, 16 Sup. Ct. 666, after elaborate consideration of the English and American cases, the supreme court of the United States concludes that:

"In passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrier company as of the traders and shippers, and in considering whether any particular locality is subjected to any undue preference or disadvantage the welfare of the communities occupying the localities where the goods are to be delivered is to be considered, as well as that of the communities which are the localities of the place of shipment, * * * and should have in view the purpose of promoting and facilitating commerce, and the welfare of all to be affected, as well the carriers as the traders and consumers of the country."

In view of this salutary declaration, how stands the trivial and problematical advantage which Brewer & Hanleiter, and perhaps

other Griffin merchants, might obtain by increasing the Macon rates, when compared to the stupendous disadvantage which would almost certainly result to the latter community, and to one of its principal railroads, if the competition of carrier with carrier and market with market, ever present there, should be ignored by the courts? Shall the authorities of government have no concern for the safety of millions of capital invested or accumulated through long years of enterprise and diligent business exertion by the people of the latter city? Shall the millions they have invested in railroads from their own means, to afford to the state great systems of transportation, result in their ruin? Shall government undertake the impossible, but injurious, task of making the commercial advantages of one place equal to those of another? It might as well attempt to equalize the intellectual powers of its people. There should be no attempt to deprive a community of its natural advantages, or those legitimate rewards which flow from large investments, business industries, and competing systems of transportation to facilitate and increase commerce. The act to regulate interstate commerce has no such purpose, and yet this appears to be the inevitable result of the relief the complainants seek in this case, without any adequate corresponding advantage either to themselves or to the community in which they live. The application is for a temporary injunction, the first effect of which would be to immediately disorganize and disarrange the entire commerce of which Macon is the receiving and distributing point, with the more injurious consequences to which I have already adverted. For the reasons stated, and because of this immediate and this ultimate result, the order of the interstate commerce commission, on which the application is based, is believed to be contrary to the policy of the law, and the relief sought by the complainants in this application is denied.