UNITED STATES ex rel. COFFMAN v. NORFOLK & W. RY. CO. et al.

(Circuit Court, D. West Virginia. June 15, 1901.)

**1. INTERSTATE COMMERCE—MANDAMUS—PLEADING — EVIDENCE — UNJUST DISCRIMINATION.**

In mandamus under the act of congress of March 2, 1889, to compel a common carrier to move and transport interstate traffic, or to furnish cars or other facilities for such transportation, on the ground that there has been such a violation of the interstate commerce act of February 4, 1887, as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given, by said common carrier for like traffic under similar conditions to any other shipper, the gist of the whole proceeding is an unjust discrimination in favor of one shipper over another similarly situated. It is for the remedy of such a wrong that congress, by the act in question, gave the federal courts the power of mandamus, and for such a wrong alone. There must not only be a discrimination, but it must be an unjust discrimination; and that character of discrimination must not only be pleaded, but it must be proved, by the relator, otherwise the writ of mandamus will be denied him.

**2. RAILROADS—DISTRIBUTION OF EQUIPMENT.**

While the capacity of a shipper of coal may be greater than his allotment of cars, yet, where such is also the case with every other operation similarly situated in the coal field, it is the duty of the railroad company, when the supply of coal cars is short, to prorate the supply on hand, without unjust discrimination, among all the operators, including the shipper in question.

**3. SAME—SPECIAL CARS.**

A railroad company's duty to allot cars without unjust discrimination among coal shippers cannot be altered by the furnishing of special cars to the railroad company by one shipper, to be used exclusively in the transportation of coal for that shipper, whether the cars are sold by the shipper to the railroad company on the installment plan, or the shipper retains title to the cars. If the cars are purchased from the shipper by the railroad company on the installment plan, the company thereby becoming interested therein at once, and finally the absolute owner thereof, then, in the event of an exclusive application of the same to the business of that shipper, there would be a time, from first to last, during which the railroad company, by such a course, would not be devoting rolling stock which it owns, or in which it is interested as a common carrier, to the demands of one shipper to the exclusion of others similarly situated, which it may not do; or, even if it should never become interested in, or the owner of, the cars, still it may not rent its tracks or permit them to be appropriated by any one to the detriment of other shippers whom it should serve to the uttermost; and in the stress of unusual business such special cars in its service would have to be applied to the accommodation of all shippers alike.

**4. SAME—SYSTEM OF COAL-CAR DISTRIBUTION.**

A system of coal-car distribution which a railroad company has applied in a given field, if that system, under the circumstances and conditions peculiar to that field, be a reasonable one, and fair to all, and is applied to all alike, affords no just cause of complaint on the part of any shipper.

(Syllabus by the Court.)

Mandamus. Issue having been joined upon the writ of alternative mandamus and respondents' return thereto, this cause came on for trial before the court without a jury, both sides, by a stipulation filed, agreeing that the issues of fact upon the pleadings might be tried and determined by the court, and expressly waiving a jury.

Harold A. Ritz and B. M. Ambler, for relator.

J. F. Brown, John H. Holt, and Jos. I. Doran, for respondents.

JACKSON, District Judge. On the 5th day of January, 1901, W. H. Coffman, who is the sales agent for the Indian Ridge Coal & Coke Company, notified the agents of the Norfolk & Western Railway Company that he had orders for 4,450 tons of coal, 2,000 tons of which he desired transported by rail from the mines of the Indian Ridge Coal & Coke Company, state of West Virginia, to Lambert's Point, state of Virginia, there to be loaded upon a vessel, which would arrive on the 14th day of said month; and the remaining 2,450 tons he desired to be transported from the same mines to the same port, there to be loaded upon the steamship Chattan, due to arrive on the 17th day of said month; but he further informed the railway company that only 2,000 tons of the 2,450 was intended for cargo for the steamship, and that the remaining 450 tons was to be loaded in her bunkers, and need not be loaded upon the vessel before the 21st day of the month. The railway company began at once to furnish the mines of the Indian Ridge Coal & Coke Company with coal cars for tide-water shipment, and continued to place at said mines its quota or percentage of all available coal cars in the coal field wherein the Indian Ridge is situate, having due regard for the needs of other operations in the field, and continued to so furnish cars until the 12th day of January, 1901; but the cars were not furnished as rapidly as Coffman desired, and believing, or pretending to believe, that the railway company was discriminating against him in the matter of cars in favor of the sales agencies of other coal operations in the field, gave notice that he would, on the 14th day of January, 1901, apply to the circuit court of the United States for the district of West Virginia, at Charleston sitting, for a writ of mandamus under the interstate commerce act, to compel it to furnish cars for said shipments. The application was not made, however, either at the time or place named, but was made to the same court at Parkersburg, on the 15th day of said month, and on that day an alternative writ of mandamus was issued against the railway company commanding it to furnish the cars as prayed for in the relator's petition, or appear on the 17th day of said month, and show cause to the contrary. The alternative writ recited that the relator, Coffman, was the factor of the Indian Ridge Coal & Coke Company for the shipment and sale of the product of its mines; that he had sold on its account 2,000 tons of coal, to be delivered at Lambert's Point, there to meet the barge R. T. Thomas on the 14th day of January, 1901, for reshipment to Providence, R. I.; and 2,450 tons, likewise to be shipped to Lambert's Point, to meet the steamer Chattan, which was due to arrive on the 17th day of said month, 450 tons of which, however, was intended for said ship's bunkers, and would not be loaded therein until the 21st day of said month; that he had demanded of the railway company the placing of cars at the mines of the Indian Ridge for these shipments, and that the railway company had failed and refused to furnish the same; that Castner, Curran,

and Bullitt were the factors and sales agents for many other coal operations situate in the same field as the Indian Ridge, and that the railway company had been and was promptly and in full filling the orders of Castner, Curran, and Bullitt for cars, and were failing and refusing to fill the relator's orders,—that is to say, the railway company was discriminating against the relator, in the matter of furnishing cars, in favor of Castner, Curran, and Bullitt; that this discrimination had lasted for a period of six months; and that the relator, in consequence, could not ship his coal upon as favorable terms as the said Castner, Curran, and Bullitt. On the return day of the writ the railway company, and L. E. Johnson, its general manager, N. D. Marr, its superintendent, D. E. Spangler, its car distributing agent, and ——— Jenks, its local car distributing agent, who had been made respondents with the railway company, appeared, and demurred to the writ, but their demurrer was overruled, and thereupon they filed their joint and separate return to the writ. The return admitted Coffman's notice to the railway company, of his two orders for the 4,450 tons, and his request of January 5th for cars in which to ship the same, and alleged in reply thereto that the respondents had at once given orders that the cars be furnished him, and that he had been regularly, promptly, and daily given his fair pro rata allotment of all available coal cars since distributed in that coal field, and that the respondents were still furnishing him cars in that way to the best of their ability. It denied all discrimination against him in favor of Castner, Curran, and Bullitt, or any one else, either with respect to the particular shipments in question, or during the six months last past, or for any other period, or at any other time. The relator moved to quash the return, but his motion was overruled, and issue was joined thereon, and a stipulation was filed by both sides waiving a jury, and agreeing to try the issue of fact thus raised to the court.

At the trial the relator, Coffman, was examined on his own behalf, as well as his bookkeeper, Mr. Hardie, Mr. Kilpatrick, the president of the Indian Ridge Coal & Coke Company, and Col. Botsford, the manager of the mines of said coal and coke company. On behalf of the respondents was heard the evidence of L. E. Johnson, general manager of the railway company, M. D. Maher, its superintendent of that portion of the road which traverses the coal field in question, and D. E. Spangler, its general car-service agent. In a general way, but accurately, upon the subject of discrimination, the evidence of the relator showed: (1) That Coffman had not received a sufficient number of cars in which to ship as much coal as the Indian Ridge mine was capable of shipping. (2) That something like 300 cars were weekly distributed to the various coal operations in the field in which the Indian Ridge is situate, in which distribution the Indian Ridge Coal & Coke Company did not participate. (3) That certain arbitraries were allowed certain coal operations in that territory; that is to say, that the Southwest Virginia Improvement Company and other coal operations in the general Pocahontas coal field were arbitrarily allotted a certain number of cars in addition to the allotment to other operations in that

field.' Upon behalf of the railway company and the other respondents it was shown as follows: (1) That it was true that Coffman did not receive a sufficient number of cars at all times, and in every case, in which to ship the full output of his principal, the Indian Ridge Coal & Coke Company, but that every other coal operation in the field was in the same, situation, and that the possibilities of one were not met any more than the possibilities of the other, but that each and all were graded and treated alike without fear or favor, without discrimination for either, or against any; that the railway had done the best for each it could, and that it did not discriminate against any. (2) That the 300 cars, more or less, distributed among the other operations, and in which the Indian Ridge did not participate, were cars placed by the railway company at the various mines, not for traffic, state or interstate, but for railroad fuel alone; and that the reason why Coffman and his Indian Ridge principal did not participate therein was because they had refused to sell the railway company its fuel coal upon the same terms that it could purchase it from other operations. (3) That upon the question of arbitraries to the Southwest Virginia Improvement Company and other operations, such arbitraries did exist; and' that the history, explanation, and justification thereof was as follows: In the beginning of the development of the coal territory in this region, the Norfolk & Western Railroad was constructed into the Pocahontas coal field east of the Great Flat Top Mountain, and several coal developments were made there. All these first operations shipped their coal to the East, or to tide water, exclusively, and there was no railroad or coal openings west of said mountain; and at that time the railway company had about 1,500 coal cars with which to serve the then existing operations east of the mountain. Subsequently it was determined to extend the railway by tunneling through the Great Flat Top, and down the grades on the western side, through the supposed coal field beyond. When this had been done at great expense, and mines opened on the western slope, it was discovered that for eastern shipment of coal it cost five or ten cents more per ton to haul coal from the mines on the western slope to tide water than it did from the mines on the eastern slope to the same point. This was in consequence of physical conditions. The grades were so steep up the western slope in tide-water shipment that three engines were required to haul the same number of cars to the summit that one engine could haul from the eastern side on to market. In other words, this railway, in consequence of natural location, had two distinct coal fields on its line in the Pocahontas territory; that is to say, the field east of the Great Flat Top and the field west of the Great Flat Top. But, in order that the eastern operations might not have such an advantage over the western operations, in consequence of the increased freight rate to the latter, as would drive the western field out of the market, it was sought to ascertain some way by which the western operations could be given the same freight rate as the eastern, and the eastern given some advantage that would compensate it, and not destroy the advantages of its natural location. In consequence of

these things, the operators east of the mountain and the operators west of the mountain agreed, or at least indicated to the railway company, that, if the same freight rate east could be applied to both fields, it would be entirely satisfactory to those located east of the mountain, provided the operations east of the mountain were equalized by receiving in an arbitrary way an additional number of coal cars for shipment of coal. This was agreed to by every operator in the two fields at the time, east and west, and the railway company subscribed thereto by allotting to the operations east of the mountain for their exclusive use the 1,500 coal cars that were in existence before the western field was opened up. This is the history of the arbitraries. (4) That the mines of the Indian Ridge Coal & Coke Company are situated west of the Great Flat Top Mountain, together with 29 other operations, 8 operations being east of the mountain, and that there are no arbitraries west of the mountain; and that the Indian Ridge and all other operations west are treated exactly alike in the delivery of cars to them for the shipment of coal. (5) That the railway company has now, has had for the past six months, and has had from the time of its extension into the western division of the Pocahontas coal field, a system of car distribution, which system, whether good or bad, has been uniformly and conscientiously adhered to without the slightest discrimination between the various coal operations in that territory. This system, in its history and detail, is as follows: The Pocahontas coal is a soft coal, and, in order to prepare it properly for market, it was discovered to be necessary to screen out the slack, and, in order that no waste might occur in consequence, it was determined that this slack should be manufactured into coke. By this arrangement the landowners would increase their royalties, the railway company its freights, and the mine operators or lessees their products for market; that is to say, the latter would have both good coal and good coke for sale, instead of inferior coal alone. The land owners, the railway company, and the mine operators all, in consequence of this situation, determined to act together for a common purpose, and to a common end. The landowners, therefore, required all their lessees or mine operators to construct 100 coke ovens for every 500 acres of coal land leased, and the railway company agreed to furnish for transportation purposes one and one-half coal cars for each coke oven completed, and distribute the same among the various operations in proportion to the number of ovens constructed by each. (6) That this was the system of car distribution at the time the Indian Ridge Coal & Coke Company entered the western field, and it agreed to the arrangement, and worked under it without complaint for years. This is shown by the testimony of its president. (7) That the railway company not only furnished one and one-half cars for each coke oven as agreed, but has furnished nearly two cars for each coke oven; and has distributed such cars among the operations in the western field without any discrimination, and among the operations of the two fields without any discrimination, except upon the arbitraries as above explained and justified. (8) That the barge R. T. Thomas, on which the first

2,000 tons of coal were to be loaded, did not arrive at Lambert's Point on the 14th day of January, 1901, and has not yet arrived; and that the barge Pendleton was not substituted in its place until the 19th day of that month, at which time there was sufficient coal on hand to load it. (9) That the steamer Chattan was reported on the 18th at Lambert's Point, instead of the 17th, and it had precedence at the pier over the barge Pendleton, and was still loading ahead of the barge as late as the 23d day of said month, at which time there was enough coal on hand at Lambert's Point, and in transit thereto from the coal fields, to load it and the barge Pendleton, too.

When we consider, therefore, the pleadings and proof and the act of congress under which this proceeding was instituted, it becomes evident that the peremptory writ of mandamus should be refused. In the first place, the gist of the whole proceeding is an unjust discrimination in favor of one shipper over another similarly situated. It is for the remedy of such a wrong that congress, by the act in question, gave the federal courts the power of mandamus, and for such a wrong alone. There must not only be a discrimination, but it must be an unjust discrimination; and that character of discrimination must not only be pleaded, but it must be proved by the relator, otherwise the writ of mandamus will be denied him. Act Cong. March 2, 1889 (supplemental to Interst. Com. Act Feb. 4, 1887); Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 276, 12 Sup. Ct. 844, 36 L. Ed. 699; Interstate Commerce Commission v. Louisville & N. R. Co. (C. C.) 73 Fed. 409; Harding v. Railroad Co., 1 Interst. Com. R. 104; Perry v. Railroad Co., 5 Interst. Com. R. 97; Brewer v. Railroad Co., 7 Interst. Com. R. 224. In the present case no unjust discrimination in favor of Castner, Curran, and Bullitt was proven. If any discrimination at all were shown, such discrimination was fully explained and justified. The only effort, as we have seen, at such proof, was the arbitraries, which were fully explained, and the 300 coal cars, in the allotment of which Coffman was not permitted to participate by reason of his own fault and refusal. While the capacity of the Indian Ridge mine may have been greater than its allotment of cars, yet that was shown to be the case with every other operation similarly situated in that field. In other words, the supply of coal cars was short, and the railway company simply prorated the supply on hand, without discrimination, among all the operations, the Indian Ridge included, which, under all the authorities, it not only had the right to do, but was compelled to do. Iowa Railroad Commissioners, 1878, p. 20; Riddle v. Railroad Co., 1 Interst. Com. R. 594. And the railway's duty was not affected in the least by proof that the president of the Indian Ridge Coal & Coke Company offered to furnish the railway company cars to be used exclusively in the transportation of coal from the Indian Ridge mines: First, because these cars were to be purchased of the Indian Ridge by the railway upon the installment plan, the railway thereby becoming interested therein at once, and finally the absolute owner thereof; so that, in the event of an exclusive application

of the same to the business of the Indian Ridge mines, there never would have been a time, from first to last, during which the railway company, by such a course, would not have been devoting rolling stock which it owned or was interested in as a common carrier to the demands of one shipper, to the exclusion of another similarly situated, which it cannot rightfully do. And, secondly, because, even if it never should become interested in, or the owner of, the cars, still it may not rent its tracks to, or permit them to be appropriated by, others, to the detriment of other shippers, whom it should serve to the uttermost. Even with such special cars in its service, when the stress of unusual business comes, the special cars would have to be applied to the accommodation of all shippers alike. The substance of the whole thing has heretofore been well expressed by Judge Cooley in the following language:

"It is properly the business of railroad companies to supply to their customers suitable vehicles of transportation (Railroad Co. v. Pratt, 22 Wall. 123, 133, 22 L. Ed. 827), and then to offer their use to everybody impartially. If the varieties of traffic are such, and their requirements of rolling stock so numerous and diversified, that this becomes impracticable or burdensome, so that the aid of their customers becomes essential or convenient, the supply obtained by their assistance cannot, with any justice, be utilized by the carrier in such manner as to establish discriminations which would otherwise be inadmissible. The carrier has no right to hire rolling stock and then allow it to be used exclusively by one class of persons on such terms as will drive out of business those who are compelled to use its own rolling stock in a competitive traffic." Rice v. Railroad Co., 1 Interst. Com. R. 503.

In the third place, it was established by the evidence that the defendant railway company has a system of car distribution, which system it has uniformly applied to all coal operations in the Pocahontas field. Therefore, if that system be a reasonable one, having been applied to all alike, there could be no just cause of complaint on the part of any. But, if it be unreasonable, then the uniform application of it might result in unjust discrimination. It will be seen, therefore, that the unreasonableness of such system is put to the test in this case; and on behalf thereof it may be said that it was demonstrated upon the trial to be not only unique, but exceptionally fair and advantageous to all concerned. It is convenient for the railway, because it is uniform in principle, and conduces to the education of its employés upon fixed and mathematical lines; and it is highly advantageous to the coal operators —First, because of the publicity of its operation. Under it secret discrimination by the railway company in favor of one operator against another is impossible. Each operation knows the number of coal cars owned by the railway company, and the number of completed coke ovens in the field. Each operation knows the number of its own ovens, and the number of its neighbors', and, in consequence, knows its particular percentage in the allotment of cars. There can be, therefore, under such a system, no secret discrimination whatever. Secondly, each operation having knowledge of the number of cars, the number of ovens, and its own percentage of distribution, knows exactly what car supply it can rely upon, and is enabled, in consequence, to employ its hands, dig, ship and sell

its coal accordingly. In other words, each operation attains regularity in its business. What may be designated as an unreliable or mercurial business—that is to say, a business first up and then down in volume—is avoided, and all the beneficial results of trustworthy regularity are realized. In addition to this, and as shown by the evidence in this cause, the history of the field in question has proven the desirability of the system, for it appears that from the opening of the field until now, notwithstanding the great number of coal operations, and the millions of business done, there has been but a single complaint, and that is the complaint made at bar. It is manifest, therefore, that this railway company's system of car distribution is not only reasonable, and fair to all, but evidently embodies the best lessons learned from other coal fields; and the court is of the opinion that the system should be approved on account of its reasonableness, and the peremptory writ denied on account of the impartiality of its application.